Eric H. Gibbs (State Bar No. 178658)
ehg@girardgibbs.com
Dylan Hughes (State Bar No. 209113)
Geoffrey A. Munroe (State Bar No. 228590)
**GIRARD GIBBS LLP**
601 California Street, 14th Floor
San Francisco, California 94104
Telephone: (415) 981-4800
Facsimile: (415) 981-4846

Steven N. Berk (*pro hac vice*)
steven@berklawdc.com
Michael Lewis (*pro hac vice*)
**BERK LAW PLLC**
1225 Fifteenth St. NW
Washington, DC 20005
Phone: (202) 232-7550
Facsimile: (202) 232-7556

Attorneys for Individual and Representative
Plaintiffs Vanessa Browne and Paul Moore

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| VANESSA BROWNE and PAUL MOORE, on behalf of themselves and all others similarly situated,<br><br>    Plaintiffs,<br><br>    v.<br><br>AMERICAN HONDA MOTOR CO., INC.,<br><br>    Defendant. | Case No.  CV 09-06750-MMM(DTBx)<br><br>**MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR AN AWARD OF ATTORNEY FEES AND EXPENSES**<br><br>Date:    July 26, 2010<br>Time:    10:00 a.m.<br>Before:  Hon. Margaret M. Morrow |

# TABLE OF CONTENTS

**Page**

I.   INTRODUCTION ................................................................................. 1

II.   ARGUMENT ...................................................................................... 2

    A.   The Court's Role In Evaluating The Agreed-Upon Fee And Cost Award To Be Paid By Honda. ................................................................. 2

    B.   The Parties' Negotiated Compromise Is The Product Of Non-Collusive Market Forces And Thus Deserves Limited Judicial Scrutiny. ..................... 3

    C.   The Negotiated Fee Is Reasonable Under California Law. .......................... 5

        1.   California Uses The Lodestar/Multiplier Method of Fee Calculation. ........................................................................ 5

        2.   Class Counsel's Lodestar In This Case Is  $1,231,612. .................... 6

            a.   Class Counsel Spent 2,827.1 Hours Representing The Class's Interests. ................................................................. 6

            b.   Applying Class Counsel's Hourly Rates Yield a Lodestar Value of $1,231,612. ............................................... 12

        3.   The Negotiated Fee Represents Class Counsel's Lodestar Enhanced By A Reasonable Multiplier Of 1.57. ............................. 13

    D.   The Parties' Negotiated Amount Includes Reimbursement for Class Counsel's Litigation Expenses. ....................................................... 18

    E.   The Incentive Awards Requested For The Named Plaintiffs Are Reasonable And Should Be Approved. ................................................ 19

III.   CONCLUSION ................................................................................. 19

i

1

## TABLE OF AUTHORITIES

2

**Case** <u></u> **Page**

3

4
*Alberto v. GMRI, Inc.*,
    252 F.R.D. 652 (E.D. Cal. 2008) ..................................................... 2, 19

5

6
*Bacca v. BMW of North America, LLC*,
    No. 06-06753-DDP (C.D. Cal. 2009) ................................................ 13

7

8
*Barboza v. West Coast Digital GSM, Inc.*,
    179 Cal. App. 4th 540 (2009) ............................................................ 17

9

10
*Broughton v. Cigna Healthplans*,
    21 Cal.4th 1066 (1999) ....................................................................... 2

11

12
*Chavez v. Netflix, Inc.*,
    162 Cal. App. 4th 43 (2008) .............................................................. 13

13

14
*City of Oakland v. Oakland Raiders*,
    203 Cal. App. 3d 78 (1988) ............................................................... 13

15

16
*Clark v. American Residential Services LLC*,
    175 Cal.App.4th 785 (2009) .............................................................. 19

17

18
*Coalition for Los Angeles County Planning in the Pub. Interest v. Board of Supervisors*,
    76 Cal. App. 3d 241(1977) ................................................................ 14

19

20
*Cummings v. Connell*,
    2006 WL 3951867 (E.D. Cal. 2006)...................................................... 4

21

22
*Glendora Community Redevelopment Agency v. Demeter*,
    155 Cal. App. 3d 465 (1984) ............................................................. 13

23

24
*Hoirup v. Professional Engineers in California Government*,
    2006 WL 2791158 (E.D. Cal. 2006)...................................................... 4

25

26
*In re Bridgestone/Firestone, Inc.*,
    288 F.3d 1012 (7th Cir. 2002) ........................................................... 15

27

28

ii

*In re Consumer Privacy Cases,*
    175 Cal. App. 4th 545 (2009) ................................................................4, 5, 6, 14

*In re First Capital Holdings Corp. Financial Products Securities*,
    1992 WL 226321 (C.D. Cal., 1992) .......................................................... 3

*In Re General Motors Dex-Cool Products Liability Litigation*,
    241 F.R.D. 305 (S.D. Ill. 2007) ............................................................ 15

*In re Vitamin Cases,*
    2004 WL 5137597 (Cal. Super. 2004)............................................... 14, 17

*Ketchum v. Moses,*
    24 Cal. 4th 1122 (2001) ..................................................................5, 13, 14

*Kim v. Euromotors West/The Auto Gallery*,
    149 Cal. App. 4th 170 (2007) ............................................................ 2

*Lealao v. Beneficial California, Inc.*,
    82 Cal.App.4th 19 (2000) ................................................................ 17

*Lobatz v. U.S. West Cellular of California, Inc.,*
    222 F.3d 1142 (9th Cir., 2000) ........................................................ 4

*Mangold v. California Public Utilities Commission*,
    67 F.3d 1470 (9th Cir. 1995) ............................................................ 5

*Natural Gas Anti-Trust Cases I, II, III & IV,*
    2006 WL 5377849 (Cal. Super. 2006)................................................ 14

*Pellegrino v. Robert Half Intern., Inc.*,
    182 Cal. App. 4th 278 (2010) ............................................................ 13

*Samuel-Bassett v. Kia Motors America, Inc.*,
    2007 WL 4099951 (Pa. Super. 2007) ................................................ 15

*Staton v. Boeing Co.*,
    327 F.3d 938 (9th Cir., 2003) ..........................................................2, 3

iii

TABLE OF AUTHORITIES

*Sternwest Corp. v. Ash*,
    183 Cal. App. 3d 74 (1986) ................................................................. 13

*Wershba v. Apple Computer, Inc.*,
    91 Cal. App. 4th 224 (2001) .......................................................... 5, 13

*Winterrowd v. American General Annuity Ins. Co.*,
    556 F.3d 815 (9th Cir. 2009) ............................................................... 6


**<u>Statutes</u>**

Cal. Civ. Code § 1780(e) ......................................................................... 2

Fed. R. Civ. P. 23(h) ............................................................................... 2

TABLE OF AUTHORITIES

# I.   **INTRODUCTION**

As part of the settlement of this class action, Plaintiffs Vanessa Browne and Paul Moore seek Court approval of a negotiated resolution of their claim for attorney fees and costs.  The underlying Class settlement provides approximately 750,000 owners of Class vehicles up to $150 when they replace their brake pads with Honda's improved brake pads, and also provides reimbursement of up to $125 for each past replacement of the allegedly defective brake pads.  (Agreement, Ex. 1 to the Joint Declaration of Eric H. Gibbs and Steven N. Berk ("Joint Declaration"), III(A)(1)-(3).)  So far, about 20,000 Class members have filed claims seeking reimbursement for past brake pad replacements, representing about $2,000,000 in claims.  (Joint Decl., ¶ 27.)  The claims period will remain open for another three years.  (Agreement, I(2), III(A)(1)-(3).)

The parties agreed that once they finalized a settlement on all Class relief, they would negotiate Plaintiffs' claim for attorneys' fees and costs in good faith, and if they were not able to resolve that claim, Plaintiffs would file a motion for fees and costs, which Honda could contest.  (Joint Decl., ¶ 23.)  After agreeing on the Class settlement, the parties began negotiating Plaintiffs' claim for attorneys' fees and costs.  (*Id.*)  When the parties' negotiations failed, they enlisted the services of a well-respected mediator – Hon. Edward A. Infante (Ret.) – and ultimately agreed that, subject to Court approval, Honda would pay attorneys' fees and costs up to $2,000,000.  (*Id.*)

The Court's function under Rule 23(h) is to ensure that the parties' agreement on fees and costs is reasonable and does not reflect a collusive settlement that placed the interest of counsel above the interest of the Class.  Here, the parties carefully separated their negotiations for the Class recovery, on the one hand, and their negotiation for attorney fees and costs, on the other, so there can be no inference of a collusive settlement.  Moreover, the amount that the parties agreed upon is reasonable under California's lodestar/multiplier approach to calculating an appropriate fee award.  When Class Counsel's costs are subtracted from the negotiated $2,000,000 fund, the remaining attorneys' fees represent a multiplier of 1.57 on a lodestar of $1,231,611.55.  Because

1   Class counsel will continue to spend significant time assisting Class members, the
2   lodestar will continue to increase and the multiplier will continue to decrease, suggesting
3   a final multiplier below 1.5.

4   **II.   <u>ARGUMENT</u>**

5       **A.   <u>The Court's Role In Evaluating The Agreed-Upon Fee And Cost Award</u>**
6           **<u>To Be Paid By Honda.</u>**

7       At the conclusion of a successful Class action, Class Counsel may apply to the
8   Court for an award of "reasonable attorney's fees and nontaxable costs that are
9   authorized by law or by the parties' agreement." FED. R. CIV. P. 23(h).  Here, the parties
10  have reached a negotiated resolution of Plaintiffs' legal claims to fees and costs, and so
11  Class Counsel are seeking an award consistent with that agreement.

12      Plaintiffs' claim to attorney fees and costs initially arises under the mandatory fee-
13  shifting provision of California's Consumers Legal Remedies Act (CLRA).  Cal. Civ.
14  Code § 1780(e) ("The court shall award court costs and attorney's fees to a prevailing
15  plaintiff in litigation filed pursuant to [the CLRA].")  "[A]n award of attorney fees to 'a
16  prevailing plaintiff' in an action brought pursuant to the CLRA is mandatory, even where
17  the litigation is resolved by a pre-trial settlement agreement." *Kim v. Euromotors*
18  *West/The Auto Gallery*, 149 Cal. App. 4th 170, 178-79 (2007).  This effectuates a crucial
19  policy goal of the State:  "[T]he availability of costs and attorneys fees to prevailing
20  plaintiffs is integral to making the CLRA an effective piece of consumer legislation,
21  increasing the financial feasibility of bringing suits under the statute." *Broughton v.*
22  *Cigna Healthplans*, 21 Cal.4th 1066, 1085 (1999).

23      The Court's role in reviewing the parties' agreed-upon award of attorneys' fees
24  and costs is to determine (1) the reasonableness of the award, and (2) whether there is any
25  evidence of fraud or collusion in the fashioning of the agreed attorney fees. *Staton v.*
26  *Boeing Co.*, 327 F.3d 938, 963-964 (9th Cir., 2003); *Alberto v. GMRI, Inc.*, 252 F.R.D.
27  652, 667-69 (E.D. Cal. 2008).

28

MEMO. IN SUPPORT OF MOTION FOR ATTORNEY FEES AND EXPENSES
CASE NO. CV 09-06750-MMM(DTBx)

**B.**    **The Parties' Negotiated Compromise Is The Product Of Non-Collusive Market Forces And Thus Deserves Limited Judicial Scrutiny.**

When considering whether an agreed-upon fee was negotiated at arm's-length, the court may apply different levels of scrutiny. "[S]ince the proper amount of fees is often open to dispute and the parties are compromising precisely to avoid litigation, the court need not inquire into the reasonableness of the fees even at the high end with precisely the same level of scrutiny as when the fee amount is litigated." *Staton,* 327 F.3d at 966. For example, in *In re First Capital Holdings Corp. Financial Products Securities*, 1992 WL 226321, *4 (C.D. Cal., 1992), the Court awarded an agreed upon $8,000,000 fee and explained, "The fee was negotiated at arm's length with sophisticated defendants by the attorneys who were intimately familiar with the case, the risks, the amount and value of their time, and the nature of the result obtained for the class. Where there is such arm's length negotiation and there is no evidence of self-dealing or disabling conflict of interest, the Court is reluctant to interpose its judgment as to the amount of attorneys' fees in the place of the amount negotiated by the adversarial parties in the litigation."

As the record reflects, there is no indication of fraud or collusion in the prosecution of this case. After reaching agreement on relief for the Class, the parties began negotiating Plaintiffs' claim under the CLRA for attorney fees and costs. (Joint Decl., ¶ 23.) When the parties failed to reach an agreement, they retained the mediation services of Judge Infante. (*Id.*) As part of the mediation the parties exchanged mediation briefs and participated in a mediation session that lasted the better part of a day. (*Id.*) Through that process, the parties reached a compromise. (*Id.*) Under the Settlement Agreement, "Defendants have agreed to pay, subject to Court approval, and to support the award of attorneys' fees, costs and expenses up to the total sum of Two Million Dollars And No Cents ($2,000,000), which shall be paid upon application by Class Counsel to the Court." (Agreement, IX(B).)

Although it would have been permissible for Class Counsel to simultaneously negotiate for a lump sum settlement that includes both the value of the Class's claims and

3

the value of counsel's fees, *see In re Consumer Privacy Cases*, 175 Cal.App.4th 545, 552-53, Class Counsel avoided any potential conflict of interest by diligently separating the interests of the Class and the interests of counsel.  (Joint Decl., ¶ 23.)  Addressing a similar situation, the court in *Cummings v. Connell*, 2006 WL 3951867, * 2 (E.D. Cal. 2006), stated that where the merits of the case were resolved before the agreement on fees "the court cannot conceive of any danger of collusion."  *See also Hoirup v. Professional Engineers in California Government*, 2006 WL 2791158, *3 (E.D. Cal. 2006).

In addition to separating the two negotiations, Class Counsel and Honda agreed that if they could not negotiate a resolution of Plaintiffs' fee and cost claim, they would present the Class settlement to the Court and litigate Plaintiffs' claim for attorney fees and costs.  In other words, the Class settlement was not contingent on an agreement on attorney fees and costs, reflecting both parties' belief that the Class settlement would stand on its own merit.  Such an agreement eliminates any notion that, with a wink and a nod, Class Counsel made unfavorable concessions with regard to the Class's claims in exchange for Honda's agreement to pay an unreasonably high attorney fee.  *See Lobatz v. U.S. West Cellular of California, Inc.,* 222 F.3d 1142, 1148 (9th Cir., 2000) (An agreement by a defendant to pay fees to class counsel "has the potential of enabling a defendant to pay class counsel excessive fees and costs in exchange for counsel accepting an unfair settlement on behalf of the class.").  Usually, such a trade off means non-cash relief in the form of coupons that have little value to class members, and a fee for the lawyers that is many multiples of the lodestar.

Here, Class Counsel maximized the cash reimbursements for individual Class members while at the same time securing a simplified and expedited claims process.  The reaction of the Class speaks for itself.  In a little over three weeks, the Claims Administrator has received more than 20,000 claims with an approximate value of $2,000,000.  (Joint Decl., ¶ 27.)  The claims period will remain open for another three years.  (Agreement, I(2), III(A)(1)-(3).)  In contrast, Class Counsel's separately negotiated attorneys' fees and costs, which if awarded in full will reflect a multiplier of

MEMO. IN SUPPORT OF MOTION FOR ATTORNEY FEES AND EXPENSES
CASE NO. CV 09-06750-MMM(DTBx)

1    less than 1.6, easily falls within California's reasonableness standard and does not reflect

2    the type of "excessive fees and costs" that undermine the public's trust when it comes to

3    class action litigation.  *See, e.g., Wershba v. Apple Computer, Inc.,* 91 Cal. App. 4th 224,

4    255 (2001) ("Multipliers can range from 2 to 4 or even higher.").

5              **C.    The Negotiated Fee Is Reasonable Under California Law.**

6                      **1.    California Uses The Lodestar/Multiplier Method of Fee
7                             Calculation.**

8              Under the CLRA, the lodestar/multiplier method is used to establish the amount of

9    reasonable attorney fees, as it is under California fee-shifting provisions generally.  *In re*

10   *Consumer Privacy Cases,* 175 Cal. App. 4th 545, 556-57 (2009); *see also Mangold v.*

11   *California Public Utilities Commission*, 67 F.3d 1470, 1478 (9th Cir. 1995) (in diversity

12   actions, state law applies "in determining not only the right to fees, but also in the method

13   of calculating the fees").

14             The lodestar/multiplier method is a two-step process of fee calculation under which

15   the Court first determines a lodestar value for the fees by multiplying the time reasonably

16   spent by Plaintiffs' counsel on the case by a reasonable hourly rate.  *In re Consumer*

17   *Privacy Cases,* 175 Cal. App. 4th at 556-557.   The Court may then enhance the lodestar

18   by applying a multiplier to take into account the contingent nature and risk associated

19   with the action, as well as other factors such as the degree of skill required and the result

20   achieved for the class.  *Id.*; *Ketchum v. Moses,* 24 Cal. 4th 1122, 1130, 1137 (2001).

21             Applying the lodestar/multiplier method to this case confirms that the fee award

22   negotiated by the parties is reasonable.  Approving the fee award authorized by the

23   parties' Settlement Agreement would be equivalent to awarding Class Counsel their

24   lodestar enhanced by a multiplier of 1.57, which is well within the range of multipliers

25   typically awarded under California fee-shifting statutes like the CLRA.  (*See* Subsection

26   3, *infra*.)

27

28

MEMO. IN SUPPORT OF MOTION FOR ATTORNEY FEES AND EXPENSES
CASE NO. CV 09-06750-MMM(DTBx)

### 2.     Class Counsel's Lodestar In This Case Is $1,231,612.

The lodestar value of Class Counsel's services is calculated by multiplying their time in the case by reasonable hourly rates for attorneys of similar skill and experience. *In re Consumer Privacy Cases,* 175 Cal. App. 4th at 556.   Class Counsel devoted a significant amount of their time to this matter over the last year, generating a total lodestar as of June 21, 2010 of $1,231,611.55, which is based on over 2,827 hours of attorney and staff time at their customary hourly rates.  (Declaration of Eric H. Gibbs, ¶¶ 8-9; Declaration of Steven N. Berk, ¶¶ 15-16); *see also Winterrowd v. American General Annuity Ins. Co.*, 556 F.3d 815, 827 (9th Cir. 2009) ("In California, an attorney need not submit contemporaneous time records in order to recover attorney fees. . . .  Testimony of an attorney as to the number of hours worked on a particular case is sufficient evidence to support an award of attorney fees, even in the absence of detailed time records.").

### a.     Class Counsel Spent 2,827.1 Hours Representing The Class's Interests.

Beginning in August 2009, Class Counsel began hearing complaints from consumers nationwide that the rear brake pads on their late model Honda Accords were wearing out well before they expected.  (Joint Decl., ¶ 7.)  Nearly without exception, consumers reported that Honda refused to cover the cost of replacing the brake pads even though their vehicles were under warranty.  (*Id.*)

Based on their experience with complex litigation, and with automotive defect litigation in particular, Class Counsel recognized that this case would present unique difficulties.  (Joint Decl., ¶ 8.)  Since brake pads are *designed* to wear out over time, Class Counsel knew litigation predicated on a defect alleged to cause a brake pad to wear out prematurely would face severe challenges on the merits and at class certification. (*Id.*)  As a result, Class Counsel's research and investigative efforts before and shortly after initiating this litigation were extensive.  (*Id.*)  For example, Class Counsel reviewed hundreds of consumer complaints and interviewed scores of Honda owners across the country.  (*Id.*)  Class Counsel also retained three consultants – a mechanical engineer, a

6

master technician, and a brake system expert – to assist in understanding the braking system, the alleged defect, and consumers' and technicians' expectations. (*Id.*) Similarly, Class Counsel compiled a wealth of data on the braking system issue and obtained all of the pertinent documents underlying the legal claims, including the Honda warranty, owner's manuals, braking system design schematics, press releases, and advertisements concerning the braking system. (*Id.*)

Over the course of their two month investigation, Class Counsel were able to reach an understanding of the case more typically arrived at during the discovery period. (Joint Decl., ¶¶ 8, 10, 12.) With the assistance of their expert consultants, Class Counsel had strong knowledge of the design of the Class vehicles' rear braking system, statistics on brake pad life, and data on the cost and frequency of ancillary braking system repairs. (*Id.*)

In addition, Class Counsel gained a strong understanding of the problems the braking system was causing for consumers, and what would be needed to provide appropriate redress to them. (Joint Decl., ¶ 10.) For example, Class Counsel learned that there was significant confusion among the Class related to the premature brake wear—some people were concerned for their safety and many more feared they would be paying for brake pad replacements on a regular basis for the next ten years. (*Id.*) Class Counsel thus sought to inform Class members and automotive technicians of the nature of the problem and provide consumers with a fix, if possible. (*Id.*) Many owners of the affected vehicles had either not yet had to replace their pads, or had replaced only one set of pads. (*Id.*) However, as more time passed without resolution, more owners would need to pay for brake pad replacements. (*Id.*) Class Counsel concluded that an early, meaningful resolution would provide the best result for Class members, so long as the remedy eliminated the need for future brake pad replacements at the frequency Class members were currently experiencing and offered Class members reimbursement for expenses already incurred. (*Id.*)

Plaintiffs filed their Class Action Complaint on September 16, 2009, and served a

Consumers Legal Remedies Act (CLRA) demand letter on Honda shortly thereafter. (Doc. #1; Joint Decl., ¶ 9.)  Plaintiffs' CLRA demand requested that Honda (i) notify Class members of the nature of lawsuit, (ii) provide Class members with a remedy to reduce required future repair costs, and (ii) reimburse Class members for costs already incurred due to the premature rear brake pad wear. (Joint Decl., ¶ 9.)  Plaintiffs contacted counsel for Honda to determine whether Honda would consider holding a preliminary discussion to assess the feasibility of an early resolution.  (*Id.*, ¶ 11.)  Honda agreed, indicating that its interests in customer satisfaction similarly demanded an expedient resolution, despite the formidable legal defenses Honda believed it had. (*Id.*)

Class Counsel were able to engage in early settlement discussions at that time only because they had already devoted significant resources to develop a thorough understanding of the relevant issues.  (Joint Decl., ¶ 12.)  By the end of September 2009, Class Counsel had interviewed about 100 Class members, obtained the failed braking system components, and had retained an additional consultant who had expertise in braking systems.  (*Id.*)  In addition, Class Counsel negotiated and entered into a confidentiality agreement with Honda to enable a productive dialogue.  (*Id.*)

The parties held their first in-person conference in San Francisco on October 2, 2009.  (Joint Decl., ¶ 13.)  In addition to counsel, the conference was attended by a paralegal, two engineers, and a braking expert.  (*Id.*)  During the conference, Class Counsel and Honda inspected the braking system itself, shared documents and had a frank exchange concerning both sides' litigation risks and the benefits of early resolution.  (*Id.*)  Additionally, at counsels' encouragement, the experts engaged in a candid dialogue concerning the design and functionality of the braking system, the causes of the purported premature wear, brake pad performance, and what possibilities existed for increasing the pads' longevity.  (*Id.*)  Honda described several potential repairs and proposed a framework for how the repairs could be provided to some of the Class.  (*Id.*)  The initial meeting concluded with the understanding that Plaintiffs would evaluate Honda's proposed framework and investigate its proposed repairs.  (*Id.*)

MEMO. IN SUPPORT OF MOTION FOR ATTORNEY FEES AND EXPENSES
CASE NO. CV 09-06750-MMM(DTBx)

1    Over the following weeks, Class Counsel continued to work with their experts,
2    seeking to ascertain whether the issue with the braking system presented a safety issue.
3    (Joint Decl., ¶ 14.)  In addition, Class Counsel evaluated the feasibility and effectiveness
4    of Honda's technical proposals for addressing the premature brake pad wear, and
5    continued to interview consumers.  (*Id.*)  Based on the ongoing investigation, Class
6    Counsel approached their next conference with Honda with two goals.  (*Id.*, ¶ 16.)  First,
7    to continue to move quickly toward a resolution involving a permanent fix—the longer
8    the Class waited for relief, the more Class members would have to pay out of pocket to
9    replace their brake pads.  (*Id.*)  And, second, to obtain compensation for the Class
10   members who had already paid to replace their brake pads. (*Id.*)

11    The parties met in-person for a second time on October 7, 2009, this time in Los
12   Angeles.  (Joint Decl., ¶ 16.)  Because of their extensive research, investigation, and
13   technical evaluations, Class Counsel were able to provide a constructive reaction to the
14   proposed framework Honda had outlined during the first conference.  (*Id.*)  Among other
15   things, Plaintiffs were able to focus and frame the potential resolution based on the
16   experiences and expectations of the many consumers Class Counsel had interviewed.
17   (*Id.*)  For instance, Class Counsel's interviews revealed that some consumers were
18   unnecessarily paying for rotor resurfacing, inflating the cost of the brake pad
19   replacements.  (*Id.*)  With this information, Class Counsel were able to increase the
20   amount of the reimbursement available for past repairs, as well as have Honda issue a
21   notice to its dealerships discouraging unnecessary rotor surfacing, which is now
22   available. (*Id.* (the notice is available to Class members on both settlement websites).)

23    Over the following weeks, the parties again met in-person and held a number of
24   telephone discussions to continue shaping an agreement that would further maximize
25   relief to consumers.  (Joint Decl., ¶ 17.)  These conversations and Class Counsel's
26   investigation encompassed a number of issues, including:  (i) the average mileage for rear
27   brake pad replacements, (ii) whether the replacements were causing other braking system
28   repairs, (iii) the average price charged for the brake pad replacement, and (iv) comparator

9

information from other Honda vehicles including from previous model years.  (*Id.*)

Through these discussions, Class Counsel reached core agreements with Honda throughout the fall of 2009.  (Joint Decl., ¶ 18.)  Although Class Counsel were close to achieving the expedient resolution of significant value that they had prioritized, they continued to press for other considerations important to the Class.  (*Id.*)  For example, Class Counsel believed it was important to ensure that the settlement benefits would actually reach as many Class members as possible.  (*Id.*)  In other words, Class Counsel would not agree to any artificial barriers that would reduce the number of people filing claims.  (*Id.*)  To achieve that goal, the parties attended a voluntary mediation session with the Court on November 18, 2009.  (*Id.*)  With the Court's assistance, the parties compromised on a speedy and consumer-friendly notice and reimbursement program.  (*Id.*)

Throughout these negotiations, the parties exchanged discovery, which provided Class Counsel with information relevant to an amended complaint, among other things.  (Joint Decl., ¶¶ 13, 19, 21.)  The amended complaint adjusted the Class definition based on facts elicited during negotiations and informal discovery, and added a demand for damages under the CLRA.  (*Id.*, ¶ 19.)  The First Amended Complaint, filed January 14, 2010, expanded the list of Class vehicles to include 2009 Acura TSXs as well as a number of 2010 Honda Accords and Acura TSXs.  (*Id.*; Doc. #25.)

Throughout the final weeks of 2009, the parties continued their negotiations in hopes of finalizing a settlement agreement.  (Joint Decl., ¶ 20.)  The negotiations involved numerous phone calls between Class Counsel and Honda's lead counsel, as well repeated exchanges of the draft settlement agreement.  (*Id.*)

While the settlement negotiations were ongoing, the parties continued to conduct discovery.  (Joint Decl., ¶ 21.)  Honda produced thousands of pages of documents, which Plaintiffs reviewed.  (*Id.*)  Following Honda's document production, Plaintiffs deposed a Honda senior engineer.  (*Id.*)  Through the discovery process Plaintiffs were able to corroborate much of what they had learned through their independent research and

investigation.  (*Id.*)  Through this process, which was ongoing on almost a daily basis over the course more than three months, Class Counsel were satisfied with their understanding of the facts that served as a basis for a Class settlement, which the parties believed they finalized in the last week of December 2009.  (*Id.*)

In January 2010, Honda raised the prospect of an alternative fix for the problem. (Joint Decl., ¶ 22.)  Again working with experts, Class Counsel engaged Honda in additional negotiation, hoping to improve upon the parties' agreement.  (*Id.*)  Among other things, Plaintiffs engaged in an expedited discovery process to verify that this new fix, while promising, would indeed be more beneficial to Class members, as well as be easier to implement across the entire Class.  (*Id.*)  The new fix included improved brake pads, which, based on Honda's testing, are expected to last at least as long as the brake pads in 2003-2007 Honda Accords (the preceding generation of vehicles).  (*Id.*)  To confirm these representations, Plaintiffs conducted additional discovery including another deposition of Honda's senior engineer and service of a set Requests for Admission.  (*Id.*) Ultimately satisfied with the results of the confirmatory discovery and their ongoing negotiations, Plaintiffs reached a final agreement with Honda in early 2010, which is reflected by the Master Settlement Agreement, dated March 4, 2010. (Joint Decl., Ex. 1.)

Following several months of negotiating the documents supporting the Settlement, such as the class notice and claim form, in March 2010, Plaintiffs filed a motion for preliminary approval of the settlement.  (*See* Docs. #27-29; Joint Decl., ¶ 24.)  The Court took the matter under submission and issued its Order granting preliminary approval on April 15, 2010.  (Doc. #34.)  Once the Court entered the order preliminarily approving the settlement, Plaintiffs worked with Honda and the Claims Administrator on a number of administrative tasks, including the settlement website and scripts to be used by employees of the Claims Administrator.  (Joint Decl., ¶ 26.)

The Claims Administrator completed the mailing of the Notice of the settlement to approximately 750,000 Class members on May 28, 2010.  (Joint Decl., ¶ 27.)  As of June 19, 2010, the Claims Administrator reports receiving over 20,000 claim forms.  (*Id.*)

MEMO. IN SUPPORT OF MOTION FOR ATTORNEY FEES AND EXPENSES
CASE NO. CV 09-06750-MMM(DTBx)

Because the improved rear brake pads became available at many dealerships in early June, the vast majority of the claims submitted to date likely are for reimbursements for prior repairs.  (*Id.*)  Class Counsel has also heard from hundreds of Class members who have indicated they plan to obtain the improved parts and submit claims in the coming months. (*Id.*)

Additionally, Class Counsel created a section on the Girard Gibbs website designed to help Class members understand and participate in the settlement.  (Joint Decl., ¶ 29.)  The website includes a "frequently asked questions" section that Girard Gibbs regularly updates, provides relevant settlement related documents, and has a form that allows Class members to ask Class Counsel questions and request to receive updates by email.  (*Id.*; Joint Decl., Ex. 2.)

Class Counsel has also received several thousand phone calls from Class members. (Joint Decl., ¶ 28.)  Girard Gibbs trained five paralegals, two contract attorneys, and a junior associate to respond to the incoming questions.  (*Id.*)  To date, Girard Gibbs' website has been visited by over 8,000 people and the firm has received over 1,000 email inquiries and 3,000 telephone calls.  (*Id.*)  Class Counsel has responded to every Class member who has contacted the firm with a question.  (*Id.*)

Taking all of the above into account, Class Counsel has spent 2,827.1 hours related to the prosecution and settlement of this case through June 20, 2010, and expects to spend several hundred additional hours through the expiration of the Settlement Agreement in 2013, for a total exceeding 3,000 hours.  (Gibbs Decl., ¶¶ 8-9; Berk Decl., ¶¶ 15-16.)

### b.     Applying Class Counsel's Hourly Rates Yield a Lodestar Value of $1,231,612.

Class Counsel's hourly rates, which vary based on the experience and skill of the attorney or staff member performing the work, are fully set forth in the separate Declarations of Eric Gibbs and Steve Berk.  (Gibbs Decl., ¶ 9; Berk Decl., ¶ 16.)  Class Counsel sets its hourly rates based on the published hourly rates in the surveys conducted by the National Law Journal, as well as the rates charged by other plaintiffs in contingent

class action cases.  (Gibbs Decl., Ex. 2 (2009 National Law Journal rate survey, which includes the average, median, and range of rates amongst firms that regularly litigate complex class action cases).)  Numerous courts overseeing complex multi-party actions have approved Class Counsel's hourly rates as reasonable, including courts in Los Angeles, California.  (Gibbs Decl., ¶ 11; Berk Decl., ¶ 13); *see Ketchum v. Moses*, 24 Cal. 4th at 1133 (the hourly rates used to calculate lodestar should be consistent with the prevailing hourly rates for "private attorneys in the community conducting *noncontingent* litigation of the same type").  For example, Girard Gibbs' hourly rates have recently been approved as reasonable in another automobile defect case recently litigated in the central district by Class Counsel.  *Bacca v. BMW of North America, LLC*, No. 06-06753-DDP, Doc. 62 (C.D. Cal. 2009) (Gibbs Decl., Ex. 3.)  Multiplying Counsel's hours to date by their hourly rates yields a current lodestar of $1,231,611.55.  (Gibbs Decl., ¶¶ 8-9; Berk Decl., ¶¶ 15-16.)

### 3.   The Negotiated Fee Represents Class Counsel's Lodestar Enhanced By A Reasonable Multiplier Of 1.57.

When Class Counsel's costs are subtracted from the $2,000,000 figure negotiated by the parties for both attorney fees and costs, the remaining amount represents a multiplier of 1.57 on Class Counsel's $1,231,611.55 lodestar.  A multiplier of 1.57 is well within the range of multipliers typically applied by California courts, confirming that the parties negotiated at arm's-length and reached agreement on a reasonable fee to be paid Class Counsel.  *See Pellegrino v. Robert Half Intern., Inc.*, 182 Cal. App. 4th 278, 290-91 (2010) (affirming multiplier of 1.75 for contested portion of the case); *Chavez v. Netflix, Inc.*, 162 Cal. App. 4th 43, 66 (affirming multiplier of 2.50); *Wershba*, 91 Cal. App. 4th at 255 ("Multipliers can range from 2 to 4 or even higher."); *City of Oakland v. Oakland Raiders*, 203 Cal. App. 3d 78, 83 (1988) (affirming 2.34 multiplier); *Sternwest Corp. v. Ash*, 183 Cal. App. 3d 74, 76 (1986) (remanding for a lodestar enhancement of "two, three, four or otherwise."); *Glendora Community Redevelopment Agency v. Demeter*, 155 Cal. App. 3d 465, 479-80 (1984) (approving fee award

MEMO. IN SUPPORT OF MOTION FOR ATTORNEY FEES AND EXPENSES
CASE NO. CV 09-06750-MMM(DTBx)

representing multiplier of 12); *Coalition for Los Angeles County Planning in the Pub. Interest v. Board of Supervisors*, 76 Cal. App. 3d 241, 251 (1977) (affirming multiplier of approximately 2).

Awarding Class Counsel an effective multiplier of 1.57 is particularly appropriate in light of the various factors courts consider when assigning a multiplier, which include:

(1)     The risks presented by the litigation;

(2)     The novelty and difficulty of the questions involved;

(3)     The results obtained on behalf of the class;

(4)     The skill exhibited by counsel;

(5)     The continuing obligation of counsel to devote time and effort to the litigation; and

(6)     The extent to which the litigation precluded other employment by the attorneys.

*See, e.g., In re Consumer Privacy Cases,* 175 Cal. App. 4th at 556; *Natural Gas Anti-Trust Cases I, II, III & IV*, 2006 WL 5377849, *3 (Cal. Super. 2006).

**Risk Presented and Novelty and Difficulty of Issues Presented.**   One of the primary purposes of awarding a fee multiplier is to compensate counsel a rate reflecting the risk of nonpayment in contingency cases.  *Ketchum*, 24 Cal. 4th at 1138.  In evaluating the contingent nature of a case, "a court should look at the circumstances that the plaintiffs faced at the outset of the litigation."  *In re Vitamin Cases*, 2004 WL 5137597, 12 (Cal. Super. 2004).  "A lawyer who both bears the risk of not being paid and provides legal services is not receiving the fair market value of his work if he is paid only for the second of these functions.  If he is paid no more, competent counsel will be reluctant to accept fee award cases."  *Ketchum*, 24 Cal. 4th at 1333.

As explained above and in the accompanying Motion for Final Settlement Approval, Class Counsel knowingly assumed a significant risk when they filed this case.

MEMO. IN SUPPORT OF MOTION FOR ATTORNEY FEES AND EXPENSES
CASE NO. CV 09-06750-MMM(DTBx)

(Joint Decl., ¶ 8.)  At that time, notwithstanding a growing number of consumer complaints, Honda had not acknowledged any problem and Honda's dealerships were consistently denying repairs under warranty.  Class Counsel have a significant amount of experience in auto defect litigation, and know from their own experience, and the experience of their colleagues, that any case involving defect claims against a major automotive manufacturer can, and often does, lead to costly litigation that goes on for years.  (*Id.*)  Even where, unlike here, the alleged defective part *is not supposed to wear out or fail at all*, auto defect litigation places enormous risk on Class Counsel.  *See, e.g., In Re General Motors Dex-Cool Products Liability Litigation*, 241 F.R.D. 305 (S.D. Ill. 2007) (nationwide class certification denied in a case involving defective intake manifold gaskets; class counsel ultimately achieved a nationwide settlement after spending 58,500 hours and $1.55 million in litigation costs to certify state classes in three state courts and prepare those cases for trial); *In re Bridgestone/Firestone, Inc.*, 288 F.3d 1012, 1019 (7th Cir. 2002) (nationwide class certification denied in Ford Explorer roll-over litigation, which ultimately settled for coupons  after 7 years of litigation, including a 50-day bench trial in California state court); *see also Samuel-Bassett v. Kia Motors America, Inc.*, 2007 WL 4099951 (Pa. Super. 2007) (defective brake case brought in 2001; jury award of $600 per class member remains on appeal).

**Result Achieved; Skill Exhibited by Plaintiffs' Counsel.**  Class Counsel's efforts have resulted in an excellent settlement, providing Class members with relief roughly equal to what they might have achieved were the Class to have prevailed at trial.  The settlement provides each of the approximately 750,000 owners of Class vehicles up to $150 when they replace their current brake pads with Honda's improved brake pads.  (Agreement, III(A)(2)-(3).)  Class members have three years from the date of vehicle purchase to replace their brake pads with the improved brake pads and seek a reimbursement of up to $150.  (*Id.*)  Many of the people who have contacted Class Counsel have indicated they plan to obtain the improved parts and submit claims in the coming months.  (Joint Decl., ¶ 27.)

The settlement also provides reimbursement of up to $125 for replacements using original Honda pads before the improved pads became available.  (Agreement, III(A)(1).) To date, the Claims Administrator reports receiving more than 20,000 claim forms. (Joint Decl., ¶ 20.)  Because these claim forms were received by June 19, it is safe to assume that almost all of the claims are seeking reimbursement for past brake pad replacements.  If the average recovery per claim form is $100, the total value of the claims submitted to date is approximately $2,000,000.[1]  Under the terms of the settlement, the deadline for Class members to submit claims for replacement of original brake pads is 90 days after the effective date, which will be no sooner than five months from now.  (Agreement, III(A)(1)-(3).)

When looked at from a macro perspective, if the claims rate for the improved brake pads is 20% and the average reimbursement is $140, Honda will reimburse $21,000,000 to Class members.  In addition, if 60,000 people file claims for reimbursement of past replacements, and the average claim is $100, Honda will pay out an additional $6,000,000.  Under these somewhat conservative projections, the settlement will provide $27,000,000 in cash value to the members of the Class.

The settlement is quite favorable from the individual Class member's perspective, as well.  As described in their accompanying brief, Plaintiffs heard from Patricia K. and Lynn W., two Class members whose experience is typical of many Class members.  (*See* Memorandum in Support of Motion for Final Approval, at 17-18.)  Under the settlement, Patricia and Lynn will be able to recover half of the costs of their prior rear brake repairs. Patricia who spent $144.95 replacing her rear brake pads, will be able to recover about $72.50.  Likewise, Lynn, who spent $170, will be eligible to claim $85.  In addition, both Patricia and Lynn will be eligible to be reimbursed after having the improved rear brake pads installed, up to $150.  For Patricia, this would mean that for two repairs, and after about 40,000 miles, she will have only spent a little over $70 in total out-of-pocket costs

---

[1]     The average assumes that some claim forms seek recovery for multiple replacements, and for rotor resurfacing.

16

MEMO. IN SUPPORT OF MOTION FOR ATTORNEY FEES AND EXPENSES
CASE NO. CV 09-06750-MMM(DTBx)

(assuming her next repair costs about the same as the previous repair).  Similarly, Lynn, after two repairs and about 50,000 miles, will only have spent a little over $100 for her two repairs.  When compared to the experiences of owners of non-Class vehicles, many of whom would have paid the full cost of a brake pad replacement (approximately $150) after about 40,000 miles, both Patricia and Lynn end up in a better position economically.

Finally, Class Counsel's commitment to resolving this case promptly and efficiently is a significant benefit to the Class.  The speed of the resolution improves the quality of the resolution because the parties can locate and distribute benefits to the Class members more readily in 2010 than would be the situation were the case resolved after years of litigation.  In addition, the speed of the settlement reflects on the efficiency of counsel and serves the interests of both justice and the judicial system.  Case law recognizes that Class Counsel should be rewarded, not punished, for early resolution of complex litigation.  *See In re Vitamin Cases*, 2004 WL 5137597 (2004) at *12 (affirming multiplier of 2.0) ("Limiting Plaintiffs' Counsel's multiplier because no class certification motion was filed or trial conducted would create a perverse financial incentive where, as here, Plaintiffs' Counsel negotiated an outstanding recovery without subjecting their clients to the uncertainties of class certification or trial."); *Lealao v. Beneficial California, Inc.*, 82 Cal.App.4th 19, 52-53 (2000) (reversing trial court)("[T]he promptness of settlement cannot be used to justify the refusal to apply a multiplier to reflect the size of the class recovery without exacerbating the disincentive to settle promptly inherent in the lodestar methodology.  Considering that our Supreme Court has placed an extraordinarily high value on settlement … it would seem counsel should be rewarded, not punished, for helping to achieve that goal.").

**Continuing Obligations.**  Under California law, Class Counsel has a continuing obligation to assist members of the class even after the judgment has been entered. *Barboza v. West Coast Digital GSM, Inc.*, 179 Cal.App.4th 540, 446-547 ("class counsel must represent all of the absent class members' interests throughout the litigation to the extent there are class issues.")  Many Class members have contacted Class Counsel

asking for updates on future developments, such as the date final approval is granted and the date the settlement becomes effective.  (Joint Decl., ¶ 30.)  Girard Gibbs has maintained a list and will be sending periodic mass email messages to the approximately 3,000 people who have requested updates.  (*Id.*)  Given the size of the Class, the fact that about 10,000 people have already contacted Class Counsel and the Claims Administrator, and the fact that many Class members will be eligible to claim reimbursements for improved rear brake pads during the next two to three years, Class Counsel expect to continue to handle incoming questions on a fairly regular basis for quite some time. (Joint Decl., ¶ 30.)

**Preclusion of Other Employment.**   This lawsuit required Class Counsel to commit a significant number of hours in a short time period to investigate and resolve the claims of the Class.  (*See* Joint Decl., ¶¶ 8-22.)  The case was staffed primarily by 6 attorneys at two small law firms, and required a significant commitment by those attorneys, making them unavailable to pursue other opportunities.  Girard Gibbs, for example, has four lawyers and two paralegals who primarily work on auto defect litigation.  In committing those limited professional resources to this matter, the result for the Class was effective and relatively rapid relief; one of the necessary consequences for the firm, however, was to delay progress on other matters and interfere with the investigation and filing of other potential cases.  (Gibbs Decl., ¶ 13.)

### D.   **The Parties' Negotiated Amount Includes Reimbursement for Class Counsel's Litigation Expenses.**

In settling Class Counsel's claims to attorney fees under the CLRA, the parties also settled Class Counsel's claims for reimbursement of their litigation expenses.  Under the Settlement Agreement, Class Counsel are seeking an aggregate amount of $2,000,000 as an award for both fees, costs, and expenses.  (Agreement, IX(B).)  The $2,000,000 agreed to be the parties, subject to the Court's approval, is thus an aggregate figure that covers both Class Counsel's fees and expenses, which are set forth in the accompanying Gibbs and Berk declarations.  (Gibbs Decl., ¶¶ 8-9; Berk Decl., ¶¶ 15-16.)

E.   **The Incentive Awards Requested For The Named Plaintiffs Are Reasonable And Should Be Approved.**

Under the Settlement Agreement, Honda will not oppose incentive awards in the amount of $1,000 each to the two named Plaintiffs, Vanessa Browne and Paul Moore. (Agreement, IX(C).)  Federal and California law approves the award of incentive awards to representative plaintiffs in class actions consistent with the nature and extent of their participation in the action.  *Alberto v. GMRI, Inc.,* 252 F.R.D. 652, 669 (E.D. Cal., 2008); *Clark v. American Residential Services LLC* (2009) 175 Cal.App.4th 785, 804-807.  Ms. Browne and Mr. Moore each spent a number of hours reviewing documents and consulting with counsel about the claims in this case, and were prepared to maintain involvement through the course of the litigation.  (Joint Decl., ¶ 31.)  This commitment of personal time to support a case in which they had a modest personal interest but that provided benefits to 750,000 absent Class members warrants Court approval of the requested incentive payments.

III.   **CONCLUSION**

For the reasons stated above, Plaintiffs respectfully request that the Court grant their application for fees and costs and award Class Counsel $2,000,000 as stated in the Settlement Agreement at paragraph IX (B).

DATED: June 21, 2010            Respectfully submitted,

                                **GIRARD GIBBS LLP**

                                By:   /s/ Eric H. Gibbs

                                Dylan Hughes
                                Geoffrey A. Munroe
                                601 California Street, Suite 1400
                                San Francisco, California 94108
                                Telephone: (415) 981-4800
                                Facsimile: (415) 981-4846

MEMO. IN SUPPORT OF MOTION FOR ATTORNEY FEES AND EXPENSES
CASE NO. CV 09-06750-MMM(DTBx)

Steven N. Berk
Michael Lewis
**BERK LAW PLLC**
1225 Fifteenth St. NW
Washington, DC 20005
Phone: (202) 232-7550
Facsimile: (202) 232-7556

*Attorneys for Individual and Representative*
*Plaintiffs Vanessa Browne and Paul Moore*

MEMO. IN SUPPORT OF MOTION FOR ATTORNEY FEES AND EXPENSES
CASE NO. CV 09-06750-MMM(DTBx)