1
2
3
4
5
6
7
8
9
10
11

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

12
13
14
15
16
17
18

| | |
|---|---|
| VANESSA BROWNE and PAUL MOORE, on behalf of themselves and all others similarly situated,<br><br>         Plaintiffs,<br><br>        vs.<br><br>AMERICAN HONDA MOTOR CO., INC.,<br><br>        Defendant. | CASE NO. CV 09-06750 MMM (DTBx)<br><br>ORDER APPROVING FINAL SETTLEMENT |

19
20
21
22
23
24

Plaintiffs Vanessa Browne and Paul Moore filed this putative class action on September 16, 2009, alleging a defect in the braking systems on certain vehicles sold by defendant American Honda Motor Company, Inc.[1]  On April 15, 2010, the court issued an order preliminarily approving a proposed settlement of the action and directing that notice of the proposed settlement be given to class members.[2]  On June 21, 2010, the parties filed a joint motion seeking final

25
26
27
28

[1]Complaint, Docket No. 1 (Sept. 16, 2009).  A first amended complaint was filed January 14, 2010.  (First Amended Complaint ("FAC"), Docket No. 6 (Nov. 24, 2008)).

[2]Order Granting Preliminary Approval of Class Settlement ("Prelim. Order"), Docket No. 34 (April 15, 2010).

approval of the class settlement.[3]  After some class members objected to the terms of the proposed settlement, the parties filed supplemental briefs and declarations in support of final approval.[4]  The court then held a fairness hearing regarding final approval of the settlement on July 26, 2010.[5]

## I.  FACTUAL BACKGROUND

### A.     The Parties and Complaint

The class includes roughly 750,000 residents of the United States, the Commonwealth of Puerto Rico, U.S. Virgin Islands, and Guam who currently own or lease specific Honda vehicles: 2008 and 2009 model year Honda Accord automobiles; 2009 model year Acura TSX automobiles; certain 2010 model year Honda Accord automobiles that plaintiffs have identified by their vehicle identification numbers; and certain 2010 model year Acura TSX automobiles that plaintiffs have identified by their vehicle identification numbers ("class vehicles").[6]  Defendant American Honda

---

[3]Memorandum in Support of Motion for Final Approval of Class Settlement ("Motion"), Docket No. 39 (June 21, 2010); Joinder in Motion for Final Approval of Class Settlement, Docket No. 38 (June 21, 2010).  See also Declaration of Eric H. Gibbs and Steven N. Berk in Support of Final Approval of Class Settlement ("Joint Decl."), Docket No. 42 (June 21, 2010); Declaration of David Stein in Support of Final Approval of Class Settlement ("Stein Decl."), Docket No. 44 (June 21, 2010).

[4]Defendant's Response in Support of Final Approval of Class Settlement ("Response"), Docket No. 47 (July 12, 2010); Plaintiffs' Reply in Support of Final Approval of Class Settlement ("Reply"), Docket No. 48 (July 12, 2010); Supplemental Declaration of Eric H. Gibbs in Support of Final Approval of Class Settlement (Supp. Gibbs Decl."), Docket No. 49 (July 12, 2010); Supplemental Declaration of David Stein in Support of Final Approval of Class Settlement ("Supp. Stein Decl."), Docket No. 50 (July 12, 2010); Supplement to Motion for Final Approval of Class Settlement ("Supplement"), Docket No. 51 (July 23, 2010).

[5]No class members requested an opportunity to speak at the hearing or attended the hearing.  In conjunction with the parties' joint motion requesting final approval of the settlement, plaintiffs filed a motion for attorneys' fees and incentive awards.  (Memorandum in Support of Motion for Attorneys' Fees, Docket No. 46 (June 21, 2010)).  At the fairness hearing, the court asked that plaintiffs' counsel submit additional information supporting the attorneys' fees request.  The court will therefore address the question of attorneys' fees in a separate order.

[6]Prelim. Order at 1.  Plaintiffs' counsel have identified the affected 2010 model year vehicles by VIN number at http://www.girardgibbs.com/hondabrakes.asp.  Excluded from the

Motor Company, Inc. ("Honda") is the U.S. sales, marketing, and distribution subsidiary of Honda Motor Co., Ltd., which manufactures the class vehicles.[7]

Plaintiffs' complaint alleges that the braking system used in the class vehicles suffers from a defect that causes excessive force to be applied to the vehicles' rear wheels.[8]  As a result, plaintiffs contend that Honda's standard-issue rear brake pads ("standard pads") wear out prematurely, requiring replacement roughly every 15,000 to 20,000 miles.  Plaintiffs argue that this rate of replacement is far more frequent than what is normal for an automobile's rear brake pads.[9]

Class representative Vanessa Browne purchased a new 2008 Honda Accord sedan in January 2009.[10]  She alleges that six months and less than 18,000 miles later, her rear brake pads required replacement.[11]  After a Honda technician at the dealership where she purchased the car quoted a replacement price of $325, Browne paid a third-party technician $160 to replace the rear brake pads.[12]  Class representative Paul Moore was forced to replace the rear brake pads on his 2008 Accord nine months and 15,000 miles after having purchased the car new.[13]

Plaintiffs allege that, despite numerous similar complaints from customers, Honda refused

_____

class are Honda, Honda's employees, employees of Honda's affiliated companies, Honda's officers and directors, Honda's counsel, insurers of class vehicles, all entities claiming to be subrogated to the rights of class members, issuers of extended vehicle warranties, and the Judge(s) to whom the litigation is or will be assigned.  (*Id.*)

[7]FAC, ¶ 6.

[8]*Id.*, ¶¶ 1, 15.

[9]In their complaint, plaintiffs alleged that rear brake pads typically last 70,000 miles or more.  (*Id.*)  At the fairness hearing, however, plaintiffs' counsel indicated further investigation had revealed Honda brake pads on non-class vehicles typically last 30,000 miles or more.

[10]*Id.*, ¶ 24.

[11]*Id.*, ¶ 25.

[12]*Id.*, ¶ 26.

[13]*Id.*, ¶¶ 30–34.

3

to replace the prematurely worn brake pads under its standard warranties.[14]  As a result, they contend, class members were forced to pay out-of-pocket for brake pad replacements they did not reasonably expect.[15]  Plaintiffs also assert that Honda's on-board computer system does not warn drivers when the brake pads have prematurely worn out.  Because drivers do not expect to have to examine their brakes after only 15,000 miles,[16] plaintiffs contend, the defect in the braking system poses an undisclosed safety risk to drivers.[17]

Plaintiffs plead four causes of action: violation of the Consumers Legal Remedies Act, California Civil Code § 1750, *et seq.*; unfair business practices in violation of California Business and Professions Code § 17200, *et seq.*; breach of written warranty in violation of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301, *et seq.*; and breach of express warranty in violation of California Commercial Code § 2313.[18]  They seek, *inter alia*, damages for class members' replacement of prematurely worn brake pads and future replacement of pads that wear out prematurely.

**B.     The Parties' Negotiations Regarding the Initial Settlement**

After hearing complaints from Honda customers, plaintiffs' counsel began to investigate the premature wear of the brake pads in August 2009, and filed a complaint on September 16.[19] Believing that Honda owners would benefit from notice and an early resolution of the problem, class counsel contacted Honda not long after the action commenced to assess whether an early settlement would be possible.[20]  After executing a confidentiality agreement to facilitate

---

[14]*Id.*, ¶ 16.

[15]*Id.*

[16]*Id.*, ¶18–19.

[17]*Id.*

[18]*Id.*, ¶¶ 44–79.

[19]Joint Decl., ¶¶ 8–9.

[20]*Id.* ¶¶ 10–11.

discussions regarding the specifics of Honda's braking system, the parties met on October 2, 2009.[21]   At this meeting, two of plaintiffs' experts discussed the technical aspects of Honda's braking system with a Honda engineer.   The technical experts exchanged views regarding the design of the braking system and its effect on brake pad wear, as well as potential modifications to the braking system that might reduce the rate of brake pad wear.   Counsel discussed the litigation risks faced by the parties.[22]

Following the meeting, class counsel investigated the nature of the damages that class members had already suffered as well as the long-term solutions suggested by Honda.[23]   The parties met again on October 7, 2009.   Class counsel raised new issues, such as the fact that class members had incurred unnecessary costs for rotor resurfacing in conjunction with replacing their brake pads.[24]   They asserted that this increased the cost of replacement, and Honda agreed to raise the level of reimbursement it was willing to pay for past repairs.   Honda also indicated that it would issue a notice to its dealers discouraging unnecessary rotor resurfacing.[25]   Class counsel continued to investigate, and the parties met several times in the following weeks to  discuss the average mileage logged prior to rear brake pad replacement; whether repairs beyond replacement of the brake pads were needed; the average price charged for brake pad replacement; and comparative information regarding unaffected Honda models.[26]

Having reached some preliminary agreements regarding compensation, the parties attended a voluntary mediation session with the court on November 18, 2009.   They were subsequently

---

[21]*Id.*, ¶ 13.

[22]*Id.*

[23]*Id.*, ¶¶ 14–15.

[24]*Id.*, ¶ 16.

[25]*Id.*

[26]*Id.*, ¶ 17.

able to agree on the form of notice to the class and the structure of the reimbursement program.[27] Based on discovery provided by Honda and additional investigation, plaintiffs' counsel also determined the scope of the class and filed an amended complaint expanding the list of class vehicles covered.[28]  Plaintiffs also conducted discovery, which included the deposition of a senior Honda engineer, to confirm their understanding of the technical issues surrounding the brake pad failure.[29]

   After exchanging preliminary drafts, the parties reached agreement on the terms of a class-wide settlement in late December 2009.[30]   In January 2010, however, Honda proposed an alternative "fix" to the brake pad problem, which it believed would provide a better resolution for class members than the one to which the parties had originally agreed.[31]  Specifically, Honda proposed installing newly developed rear brake pads ("new material pads") that allegedly last "at least as long as the brake pads in 2003–2007 Honda Accords (the preceding generation of vehicles)."[32]  After Honda made this proposal, plaintiffs' counsel conducted additional expedited discovery regarding the company's testing of the new brake pads to confirm the expected rate of wear.  They deposed the senior Honda engineer again, and served requests for admission.  Ultimately, plaintiffs' counsel concluded that installation of the new material brake pads developed

---

[27]*Id.*, ¶ 18.

[28]*Id.*, ¶ 19.  Honda gave plaintiffs a list of all vehicles with the defective braking system, and later gave Rust Consulting, which is acting as claims administrator, the names and last known addresses of 743,959 potential class members.  (Affidavit of Schuyler Asari ("Asari Affidavit"), Docket No. 47 (July 12, 2010).)  Having served a Consumers Legal Remedies Act ("CLRA") demand letter in September 2009 (Joint Decl., ¶ 9), plaintiffs' first amended complaint also added a claim under the CLRA.

[29]Joint Decl., ¶ 21.

[30]*Id.*, ¶¶ 20, 22.

[31]*Id.*, ¶ 22.  The parties do not describe the original "fix" to which they agreed, nor how the new "fix" improves on it.

[32]*Id.*  In addition to installing the newly developed brake pads, the parties propose an adjustment to the vehicles' calipers.

by Honda would provide a better resolution for class members.  As a result, the parties included the proposal in the settlement agreement submitted to the court for preliminary approval.[33]  The new material pads became available to consumers in June 2010.[34]

### C.    The Addendum to the Settlement Agreement

During the course of initial settlement negotiations, the parties disagreed as to whether class members who replaced their original Honda brake pads with non-Honda parts should be reimbursed.[35]  Honda resisted offering such vehicle owners reimbursement on the basis that doing so might encourage people to install inappropriate brake pads on Honda vehicles and on the further basis that it would be difficult to audit the validity of claims involving non-Honda service dealers.[36]  Class counsel ultimately dropped their demand that Honda reimburse the cost of non-Honda brake pads; they felt that "because the overall settlement provided for future rear-brake pad replacements through a simplified procedure, they could not justify delaying or setting aside the settlement because it lacked reimbursement for non-Honda rear brake pads."[37]

After the court preliminarily approved the proposed settlement agreement, which did not provide for such reimbursement, notice was sent via first class mail to 743,559 potential class members during the week of May 24, 2010.[38]  The notice outlined a procedure by which class

--------

[33]*Id.*

[34]At the fairness hearing, Honda's counsel stated that, when Honda distributed the new material pads to Honda and Acura service departments, it simultaneously retrieves any unsold standard pads.

[35]Supp. Gibbs Decl., ¶ 3; Affidavit of Roy M. Brisbois Re Addendum to Master Settlement Agreement ("Brisbois Decl."), Docket No. 47 (July 12, 2010), ¶ 3.

[36]Brisbois Decl., ¶ 4.

[37]Supp. Gibbs Decl., ¶ 3.

[38]Affidavit of Stacy Nesbit Regarding Notification ("Nesbit Affidavit"), Docket No. 47 (July 12, 2010), ¶ 10.  Rust Consulting, which is acting as the claims administrator, notified potential class members based on names and last known addresses provided by Honda for purchasers or lessees of class vehicles.  (*Id.*, ¶ 9.)  Rust also verified and updated addresses based on the National Change of Address database.  (*Id.*)

members could assert objections to the settlement.  The most common objection raised was that the settlement did not provide reimbursement to class members who chose to replace their prematurely worn Honda brake pads with non-Honda parts.[39]  Because its ultimate goal in settling the action was "to promote customer good will," Honda agreed to amend the settlement to reimburse class members for one installation of non-Honda brake pads at the same rate as it had agreed to pay for replacement with Honda parts.[40]  The parties notified the court of this modification on July 12, 2010, as part of their briefing in support of final approval of the settlement.[41]

### D.   Negotiations Regarding Attorneys' Fees, Costs, and Incentive Awards

The parties purposefully did not discuss attorneys' fees, costs, or incentive awards for the class representatives until early 2010, after an initial settlement on the merits had been reached.[42]  After unsuccessful attempts to negotiate an agreement on these issues, the parties engaged the Honorable Edward A. Infante (Ret.) to conduct a mediation.[43]  As a result of the mediation, Honda agreed not to oppose a request by plaintiffs' counsel for attorneys' fees and costs of $2 million and incentive awards of $1,000 to each class representative.  These amounts will be paid

---

[39]Brisbois Decl., ¶ 5.  As will be detailed *infra*, 57 of 117 objections received by the court concerned this issue.

[40]*Id.*, ¶ 5; Exh. A ("Settlement Addendum").  The ten-day limit on the claims administrator's investigation of prior brake pad replacements involving Honda parts does not apply to its investigation of replacements involving non-Honda parts.  (*Id.*)

[41]Reply at 1.  On July 9, 2010, class counsel sent letters to those class members who had opted out of the settlement, advising them of the modification, and stating that they had until July 23, 2010 to elect to opt back into the class.  (Supp. Stein Decl, ¶ 8.)  As discussed *infra*, the court has directed the parties to submit an additional notice for approval by the court that will unambiguously advise class members who opted out of the effect of the modification of the settlement terms and afford them sixty days to opt back into the class.

[42]Joint Decl., ¶ 23.

[43]*Id.*

by Honda and will not affect the recovery of the class.[44]

### E.     The Terms of the Settlement

Under the settlement agreement, Honda will reimburse class members for (1) costs associated with the installation of Honda's new material brake pads and (2) costs incurred in connection with earlier replacement of rear brake pads up to specified limits.[45]  Reimbursable costs include the cost of replacement brake pads and labor costs associated with installation of the pads, adjustment of the calipers, and resurfacing of the rotors.[46]  Instructions for the adjustment of the vehicle's calipers will also be included with the packaging of all new material brake pads.[47]  Because the parties agree that rotor resurfacing should rarely be required, Honda has issued a notice to its dealers "discourag[ing] unnecessary services or repairs to the Class Vehicles' Rear Braking System, including the unnecessary resurfacing of rotors."[48]

Class members can seek full reimbursement up to $150 for one replacement of their rear brake pads with the new material brake pads.[49]  The settlement agreement freezes the suggested retail price of a set of the new material brake pads at $66.66 for one year, and limits price increases to 5 percent in each of the next two years.[50]  Class members are not required to have

---

[44]*Id.*  As noted, class counsel's request for attorneys' fees and incentive awards will be addressed in a separate order.

[45]Joint Decl., Exh. A ("Settlement Agreement").  At the fairness hearing, Honda's counsel stated that the new material pads were distributed nationwide in June 2010, and that the standard brake pads previously used on class vehicles were retrieved.

[46]Reply at 6 ("[T]he compensation offered for past repairs . . . cover[s] out-of-pocket expenses for brake rotor resurfacing and calipers adjustments performed in connection with a rear brake pad replacement," citing Settlement Agreement).

[47]Settlement Agreement at 13.

[48]*Id.*

[49]*Id.* at 11–12.  Plaintiffs' counsel state that "based upon [their] investigation, the national average for rear brake pad replacements is slightly more than $150, typically between $150 and $170."  (Joint Decl., ¶ 25.)

[50]Settlement Agreement at 12.

the repairs done at Honda dealerships, allowing them to shop for the lowest labor costs or to replace the brake pads themselves.[51]  To be eligible for reimbursement, class members must replace their rear brake pads with the new material pads within three years of the date they purchased or leased the vehicle or within ninety days of the date of final approval of the settlement, whichever is later.[52]  After replacement, class members have ninety days to submit a claim for reimbursement to the administrator.[53]

Class members can also seek reimbursement for 50 percent of the out-of-pocket costs they incurred as a result of earlier replacements of the rear brake pads up to $125.[54]  This reimbursement is available wherever the pads were replaced and whether or not the pads were replaced with Honda parts.[55]  Class members may seek reimbursement for multiple replacements of their brake pads if Honda parts were used, but may only seek reimbursement for one replacement with non-Honda parts.[56]  Class members must submit a claim for the repairs within ninety days of final approval of the settlement.[57]

To obtain reimbursement, class members must submit a receipt or other documentation of their out-of-pocket costs to the claims administrator; provide their name, address, telephone number, and date of purchase or lease; and sign a certification form.[58]  Within ten days of receipt of a claim, the administrator is required either to send a reimbursement check or a written

---

[51]As reimbursement is limited to out-of-pocket costs, class members who replace the brake pads themselves can seek reimbursement only for the cost of the replacement pads.

[52]Settlement Agreement at 12, ¶ 3.

[53]*Id.*

[54]Settlement Agreement at 11, ¶ 1.

[55]Settlement Addendum.

[56]*Id.*

[57]Settlement Agreement at 12, ¶ 3.

[58]Joint Decl., ¶ 18.

explanation of its denial of the claim.[59]  This ten-day period does not apply to claims seeking reimbursement for the installation of non-Honda brake pads.  As to these claims, the claims administrator may take as long as reasonably required to investigate the validity of the claim.[60] If a claim is denied, the class member can seek review by a Better Business Bureau arbitrator at Honda's expense.[61]

All expenses associated with administering the settlement, including the fees charged by the claims administrator and the cost of all notices to the class is to be borne solely by Honda.[62] Honda will also pay attorneys' fees and litigation costs awarded by the court up to a maximum of $2 million, as well as incentive awards to the class representatives approved by the court.[63] In exchange, class members must release Honda from all claims for defects in the class vehicles' rear braking system alleged in this action.[64]  "The Settlement Agreement and Release does not release claims for personal injury property damage, or claims for subrogation."[65]

### F.   Notice to the Class of the Proposed Settlement

After the court preliminarily approved the proposed settlement, Honda gave the claims administrator, Rust Consulting ("Rust"), the names and last known addresses of all 743,959 purchasers and lessees of class vehicles.[66]  Rust verified and updated the addresses, using the

---

[59]Settlement Agreement at 7.

[60]Settlement Addendum.

[61]Settlement Agreement at 15–16.

[62]*Id*. at 21.

[63]*Id*.

[64]*Id*. at 19.

[65]*Id*. at 20.  The release similarly does not extend to claims against Honda and Acura dealers for "independent tort liability relating to their servicing or repair of the rear braking system on the Class vehicles."  (Motion at 8.)

[66]Asari Affidavit, ¶¶ 1–2.

National Change of Address database, and eliminated incomplete and foreign records.[67]  During the week of May 24, 2010, it sent the court-approved notice of proposed settlement via first class mail to 743,559 potential class members.[68]  The notice stated that class members had until July 5, 2010 to opt out of the proposed class.

After the post office returned 2,711 of the notices Rust mailed, with forwarding address information, Rust mailed notices to the new addresses.[69]  It also created a website at www.accordsettlement.com on which it posted the class notice as well as general information about the case.[70]  Finally, Rust set up a toll-free support line, 1-888-398-8211, which offered recorded information regarding the proposed settlement and on which class members could leave questions and requests for notice packages.[71]

Rust reports that it has answered 3,458 calls seeking information regarding the settlement, and that the website has received 26,358 unique visitors.[72]  In response to requests, Rust mailed an additional 287 notices.[73]  As of July 22, 2010, Rust had received more than 39,000 claims,[74] and 521 elections to opt out of the class.[75]  On July 9, 2010, after the parties agreed to amend the settlement to include some reimbursement for replacements that involved non-Honda parts, class counsel sent a letter to each class member who had opted out, advising of the change

---

[67]Nesbit Affidavit, ¶¶ 9–10.

[68]*Id.*, ¶ 10.

[69]*Id.*, ¶ 11.

[70]*Id.*, ¶ 6.

[71]*Id.*, ¶ 7.

[72]Supp. Stein Decl., ¶ 5.

[73]Nesbit Affidavit, ¶ 10.

[74]Supplement at 1.  Because the new material brake pads became available only in June 2010, the claims likely seek reimbursement for prior replacements with standard Honda brake pads.

[75]*Id.*

1    and stating that the class member could opt back into the class on or before July 22, 2010.[76]  As

2    of July 22, 2010, forty-one class members had opted back into the class, leaving 480 opt-outs.[77]

3    Honda will provide notice of final approval of the settlement and of the expanded benefits

4    available as a result of the addendum to the settlement by mailing a court-approved postcard to

5    all class members.[78]

## II.  DISCUSSION

### A.    Final Approval of the Proposed Class Action Settlement

Rule 23(e)(1)(A) of the Federal Rules of Civil Procedure requires that the court "approve

any settlement, voluntary dismissal, or compromise of the claims, issues, or defenses of a certified

class."   Approval under Rule 23(e) involves a two-step process "in which the [c]ourt first

determines whether a proposed class action settlement deserves preliminary approval and then,

after notice is given to class members, whether final approval is warranted."   *National Rural

Telecommunications Cooperative v. DIRECTV, Inc. ("NRTC")*, 221 F.R.D. 523, 525 (C.D. Cal.

2004) (citing MANUAL FOR COMPLEX LITIGATION, THIRD, § 30.14, at 236-37 (1995)).  The Ninth

Circuit has noted that, in considering whether to give final approval to a class settlement, "there

is a strong judicial policy that favors settlements, particularly where complex class action litigation

is concerned."   *In re Synocor ERISA Litigation*, 516 F.3d 1095, 1101 (9th Cir. 2008); see *id.*

("This policy is also evident in the Federal Rules of Civil Procedure and the Local Rules of the

United States District Court, Central District of California, which encourage facilitating the

settlement of cases"); *Officers for Justice v. Civil Service Commission*, 688 F.2d 615, 625 (9th

Cir. 1982), cert. denied, 459 U.S. 1217 (1983) ("[I]t must not be overlooked that voluntary

conciliation and settlement are the preferred means of dispute resolution.  This is especially true

---

[76]Supp Stein Decl., ¶ 8.

[77]Supplement at 1.

[78]Response at 5.   The parties provided proposed language for the postcard with their
supplemental briefing.  (Supplement, Exh. 1.)

1   in complex class action litigation").

2   **1.   Notice Requirements**

3   Rule 23(e) requires that "notice of the proposed dismissal or compromise [of a class action]

4   shall be given to all members of the class in such manner as the court directs." FED.R.CIV.PROC.

5   23(e). The notice given must be "reasonably calculated, under all the circumstances, to apprise

6   interested parties of the pendency of the action and afford them an opportunity to present their

7   objections." *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950); see also

8   *Mandujano v. Basic Vegetable Products, Inc.*, 541 F.2d 832, 835 (9th Cir. 1976) ("To comply

9   with the spirit of [Rule 23(e)], it is necessary that the notice be given in a form and manner that

10  does not systematically leave an identifiable group without notice").

11  The court's role in reviewing a proposed settlement is to represent those class members

12  who were not parties to the settlement negotiations and agreement. See *San Francisco NAACP*

13  *v. San Francisco Unified School District*, 59 F.Supp.2d 1021, 1027 (N.D. Cal. 1999) ("The

14  purpose of Rule 23(e) is to protect 'unnamed class members from unjust or unfair settlements

15  affecting their rights when the representatives become fainthearted before the action is adjudicated

16  or are unable to secure satisfaction of the individual claims by a compromise,'" quoting *Amchem*

17  *Products, Inc. v. Windsor*, 521 U.S. 591, 623 (1997)). One aspect of the court's role is to ensure

18  that all class members receive adequate notice of the proposed settlement.

19  After the form of the notice was approved by the court, Honda searched its files to

20  determine the names and last known addresses of all purchasers and lessees of class vehicles.[79]

21  It gave this information to Rust, which verified and updated the addresses using the National

22  Change of Address database.[80] During the week of May 24, 2010, Rust sent the court-approved

23  notice of proposed settlement via first class mail to 743,559 potential class members.[81]

24  All notices that were returned with forwarding address information were re-mailed to the

26  [79]Asari Affidavit, ¶¶ 1–2.

27  [80]Nesbit Affidavit, ¶¶ 9–10.

28  [81]*Id.*, ¶ 10.

new addresses.[82]  Rust also created a website at www.accordsettlement.com on which it posted the class notice and general information about the case.  Class counsel posted information regarding the settlement on their website as well.[83]  Several national news publications, including the *New York Times* and *U.S. News and World Report*, printed articles regarding the settlement.

To assist potential class members who had questions about the settlement, Rust set up a toll-free support line, which offered recorded information about the settlement and on which class members could leave questions and requests for notice packages.[84]  Rust has answered 3,458 calls seeking information, and the website it established has had 26,358 unique visitors.[85]  In response to requests, Rust also mailed an additional 287 notices of settlement.[86]  As of July 22, 2010, Rust had received more than 39,000 claim forms.  A total of 480 class members had elected to opt out of the class.[87]

The court is satisfied that the parties' efforts were reasonably calculated to apprise class members of the pendency of the action and the terms of the proposed settlement.  The parties not

---

[82]*Id.*, ¶ 11.

[83]*Id.*, ¶ 6.

[84]*Id.*, ¶ 7.

[85]Supp. Stein Decl., ¶ 5.

[86]Nesbit Affidavit, ¶ 10.

[87]Supplement at 1 (noting that 521 class members originally opted out, but 41 withdrew their request for exclusion after receiving notice of the modification to the settlement).  At the fairness hearing, Honda argued that 14 opt-out requests had been mailed after the July 5, 2010 deadline and requested that they be included in the class.  Given the limited number of belated requests, and the fact that notice regarding the modification to the settlement may cause some of these individuals to opt back into the class voluntarily, the court concludes it is appropriate to treat these requests for exclusion as effective.  *Silber v. Mabon*, 18 F.3d 1449, 1454 (9th Cir. 1994) ("[T]he Ninth Circuit has recognized that the district court has discretion to extend a class member's time to opt out," citing *In re Gypsum Antitrust Cases*, 565 F.2d 1123, 1128 (9th Cir. 1977)); *Manhattan-Ward, Inc. v. Grinnell Corp.*, 490 F.2d 1183, 1186 (2d Cir. 1974) (stating that a court has discretion to extend a class member's time to opt out under Rule 6(b)(2) and 60(b)(1) as well as generally under Rule 23).

only mailed notice to a complete list of known members of the settlement class, but also posted information regarding the settlement on the Internet and on a toll-free telephone line.  Particularly given the significant number of claims that Rust has already received, the court finds that class members have received adequate notice of the settlement and have had adequate opportunity to file a claim form, opt out of the class, or object to the settlement.

After mailing notice of the proposed settlement, however, the parties agreed to amend its terms.[88]  Because the addendum increases benefits to the class, the parties argue that additional notice need not be sent to the entire class and that an additional period for objections need not be provided.[89]  Courts have generally not required that additional notice be provided to the full class where modification of a settlement increases benefits to the class.  See *In re Prudential Ins. Co. of Am. Sales Practices Litig.*, 962 F.Supp. 450, 473 (D.N.J. 1997) ("Class members have already received adequate notice both of the pendency of this class action and of the Proposed Settlement. Class members need not be informed of the Final Enhancements to the settlement because the Proposed Settlement is only more valuable with these changes"); *In re Remeron End-Payor Antitrust Litigation*, No. Civ. 02-2007 FSH, Civ. 04-5126 FSH, 2005 WL 2230314, *19 (D.N.J. Sept. 13, 2005) ("[T]he boilerplate provision that allows for modification of the settlement without notice to class is satisfactory and necessary.  The class is protected from adverse modifications by Rule 23 and the requirements of due process, regardless of what the provision says, and the Court is charged with enforcing these protections.  Minor modifications may be necessary to a settlement agreement (indeed may be favorable to the class), and additional class notice is not always required because, e.g., of the cost of notice that would take recovered money from the class").  The court concurs that additional notice to the full class and a further period for objections is not required here.[90]

_____

[88]Settlement Addendum.

[89]Reply at 1; Response at n.2.

[90]Honda has agreed to send a postcard to all class members stating that the court has finally approved the settlement, and outlining the additional benefits available as a result of the

1    Courts have generally required, however, that class members who previously opted out be

2    given notice of a modification and time to decide whether they wish to rejoin the class.  See *In*

3    *re Prudential Ins. Co. of Am. Sales Practices Litig.*, 962 F.Supp. at 473 ("Plainly, class members

4    who declined to opt out earlier, would not choose to do so now.  Moreover, class members who

5    opted out may now desire to participate in the Proposed Settlement, given the added value of the

6    Final Enhancements.  For this reason, the Court will order that a special notice be sent to the

7    opt-outs to permit them to reevaluate their choices"); *In re Remeron End-Payor Antitrust*

8    *Litigation*, 2005 WL 2230314 at *19  (approving a settlement where "the adjustment that was

9    made to the settlement that favored the class, after notice went out, was followed by additional

10   notice and by opportunity for any opt-outs to return to the class in order to partake in the

11   additional recovery").

12   Class counsel sent a letter on July 9, 2010 to each class member who had opted out,

13   advising of the modified terms of the settlement, and asking if the class member wished to opt

14   back into the class.[91]  Counsel state that as of July 22, 2010, forty-one individuals have indicated

15   they wish to opt back into the class.[92]

16   The letter that class counsel sent class members who had opted out does not unambiguously

17   inform class members who replaced the brake pads on their Honda or Acura vehicle with non-

18   Honda parts that they can seek reimbursement for only one prior replacement.  The letter

19   summarizes the terms of the parties' original settlement, including the fact that there was "no

20   limit" on the number of past replacements for which class members could seek reimbursement if

21   the worn out brake pads were replaced with Honda or Acura parts.  It then states:

22   "Previously, reimbursements under the second category were available only if

23   Honda or Acura rear brake pads were used as replacements.  The Parties have

24   _____

25   addendum. (Supplement, Exh. 1.)  The court approves postcard notification to all class members

26   in the form attached as Exhibit A to this order.

27   [91]Supp Stein Decl., ¶ 8; Exh. 6 (July 9, 2010 letter to opt outs).

28   [92]Supplement at 1.

1    agreed to modify that aspect of the Settlement Agreement as follows: **Those who**

2    **paid to replace rear brake pads with non-Honda or non-Acura parts can now**

3    **claim reimbursement for half the expense of one such repair, up to $125**."[93]

4    Although an individual reading the letter closely would understand that class members could seek

5    reimbursement for only one replacement with non-Honda parts, someone reviewing the letter

6    quickly might conclude that class members who replaced with non-Honda parts were now entitled

7    to the same reimbursement as those who replaced with Honda parts – i.e., there was "no limit"

8    on the number of past replacements for which they could seek reimbursement.

9        More importantly, counsel's letter gave class members who had opted out only fourteen

10    days to opt back into the class. While presumably class members who affirmatively opted out of

11    the settlement were familiar with its terms, and likely to pay attention to further correspondence

12    regarding it, this is nonetheless a short time within which to require a response. The letter,

13    moreover, was not an official notice stating that it had been authorized by the court, but a

14    communication sent by plaintiffs' counsel. As a consequence, some class members may have

15    assumed that it did not affect their legal rights. For these reasons, the court concludes that a

16    formal notice, which reflects that it has been authorized by the court, unambiguously describes

17    the nature of the modification to the settlement terms, and provides adequate time for class

18    members to opt back into the class, is required.

19        Following the fairness hearing at which the court raised these concerns, the parties

20    submitted proposed language for a formal notice to be sent to class members who had earlier

21    opted out.[94] The court approves the giving of notice to these class members in the form attached

22    as Exhibit B to this order. The parties are directed to mail this notice by August 6, 2010 to all

23    class members who exercised their right to opt out, and to give those class members until October

24    5, 2010 to opt back into the class. The court concludes that, once this notice has been sent, the

25    notice requirements of Rule 23(e) will have been satisfied.

26

27    [93]Supp Stein Decl., Exh. 6.

28    [94]Joint Report of Letter Notice, Docket No. 54 (July 29, 2010), Exh. 3.

## 2.       Fairness of the Proposed Settlement

"The role of a court . . . reviewing the proposed settlement of a class action under Fed.R.Civ.P. 23(e) is to assure that the procedures followed meet the requirements of the rule and comport with due process and to examine the settlement for fairness and adequacy." *Vaughns v. Board of Education of Prince George's County*, 18 F.Supp.2d 569, 578 (D. Md. 1998). The district court's role, in reviewing "what is otherwise a private consensual agreement negotiated between the parties to a lawsuit, must be limited to the extent necessary to reach a reasoned judgment that the agreement is not the product of fraud or overreaching by, or collusion between, the negotiating parties, and that the settlement, taken as a whole, is fair, reasonable and adequate to all concerned." *Officers for Justice*, 688 F.2d at 625.

The parties contend that the settlement is presumptively fair because it is a result of good faith, arms-length negotiations. See *NRTC*, 221 F.R.D. at 528 ("A settlement following sufficient discovery and genuine arms-length negotiation is presumed fair," citing *City Partnership Co. v. Atlantic Acquisition Ltd, P'ship*, 100 F.3d 1041, 1043 (1st Cir. 1996)). They note that (1) they engaged in substantial discovery, including confidential discussions between plaintiffs' experts and Honda engineers, to explore the problem with Honda's braking system and identify an appropriate solution; (2) they participated in a voluntary mediation conducted by the court; and (3) they reached a carefully negotiated agreement that was amended twice to provide greater benefits to class members. The court agrees that the agreement was reached in good faith after a well-informed arms-length negotiation and is entitled to a presumption of fairness. Nonetheless, it must examine the terms of the settlement and consider relevant factors to determine whether the settlement is indeed fair.

In making this assessment, the court balances:

"(1) the strength of the plaintiffs' case; (2) the risk, expense, complexity, and likely duration of further litigation; (3) the risk of maintaining class action status throughout the trial; (4) the amount offered in settlement; (5) the extent of discovery completed and the stage of the proceedings; (6) the experience and views of counsel; (7) the presence of a governmental participant; and (8) the reaction of

1    the class members to the proposed settlement." *Churchill Village, L.L.C. v.*
2    *General Electric*, 361 F.3d 566, 575 (9th Cir. 2004) (citing *Hanlon v. Chrysler*
3    *Corp.*, 150 F.3d 1011, 1026 (9th Cir. 1998)).

4    This list of factors is not exclusive, "and different factors may predominate in different factual
5    contexts." *Torrisi v. Tuscon Electric Power Co.*, 8 F.3d 1370, 1376 (9th Cir. 1993).  See also
6    *Churchill Village*, 361 F.3d at 576 n. 7 ("Because the settlement evaluation factors are
7    non-exclusive, discussion of those factors not relevant to this case has been omitted"); *Young v.*
8    *Polo Retail, LLC*, No. C-02-4546 VRW, 2007 WL 951821, *3 (N.D. Cal. Mar. 28, 2007)
9    (adding as relevant factors "(9) the procedure by which the settlements were arrived at, see
10   MANUAL FOR COMPLEX LITIGATION (FOURTH) § 21.6 (2004), and (10) the role taken by the
11   plaintiff in that process").

12                          **a.     Strength of Plaintiffs' Case**

13          Plaintiffs maintain they have a strong legal claim, but recognize certain weaknesses that
14   might have limited or precluded recovery had the litigation proceeded.  Plaintiffs sought to prove
15   that the braking system installed on class vehicles was defective and caused the rear brake pads
16   to wear out prematurely.  They contend they would have been able to adduce evidence that the
17   rear brake pads on non-class Honda vehicles typically last 30,000 miles or more, and that Honda
18   knew or should have known that the rear brake pads on class vehicles would wear out in 15,000
19   to 20,000 miles.[95]   They assert that although this premature wear did not meet consumers'
20   reasonable expectations, Honda failed to disclose material information regarding it to class
21   members.

22          To recover on their breach of warranty, unfair competition, and CLRA claims, however,
23   plaintiffs would have had to overcome Honda's claim that brake pads are "wear" parts that

24
25

26          [95]Motion at 13.  Although the complaint alleged that the brake pads on non-class Honda
27   vehicles typically need replacement at 70,000 miles, plaintiffs' counsel stated at the fairness
     hearing that investigation had revealed that Honda brake pads on non-class models typically wear
28   out at 30,000 miles or more.

necessarily require regular replacement and are therefore not warranted.[96]  Even had plaintiffs been able to prevail on their breach of warranty claim, moreover, the limits on the warranty – generally three years or 36,000 miles – might significantly have restricted class members' ability to recover.[97]  Cf. *Daugherty v. American Honda Motor Co., Inc.*, 144 Cal.App.4th 824, 830–39 (2006) (affirming dismissal of express warranty, unfair competition, and CLRA claims based on an alleged defect that reduced the life span of the vehicle's engine, but did not cause the automobile to malfunction during the warranty period).  Additionally, to establish that the brake pads on class vehicles wear out prematurely as compared with the brake pads on other Honda models, plaintiffs would have had to assemble and present complicated proof, including expert testimony.  Because the speed with which brake pads wear can also be affected by the manner in which the vehicle is driven, plaintiffs would also have faced significant causation issues.  Finally, Honda would likely have argued that it did not fail to disclose material facts to consumers because it was not aware of any problem with the braking system.[98]  All of these issues would have posed challenges for plaintiffs in establishing Honda's liability for the premature brake pad wear.  The court therefore concludes that this factor weighs in favor of final approval of the settlement.

## b. The Risk, Expense, Complexity, and Likely Duration of Further Litigation

The parties argue that this factor also weighs in favor of approval of the settlement because they would have incurred significant expenses preparing for and trying the case.  In particular, they contend there would have been substantial costs associated with expert analysis of Honda's braking system and whether it was defective due to the force the system applied to the rear brakes.  Plaintiffs would also have been required to conduct extensive discovery to develop evidence suggesting that Honda knew of problems with the braking system.  Because of the technical

---

[96]*Id*. at 14.

[97]*Id*.

[98]*Id*. at 14–15.

complexity of the issues central to plaintiffs' claims, both discovery and trial would have consumed significant time.  Plaintiffs' counsel note, in this regard, that they have spent more than four years litigating similar automotive defect cases.[99]  Had the parties aggressively litigated class certification and tried the case, it could have consumed substantial party and court resources.  There is a "strong judicial policy that favors settlements, particularly where complex class action litigation is concerned." *Linney v. Cellular Alaska Partnership*, 151 F.3d 1234, 1238 (9th Cir. 1998).  The court thus concludes that this factor weighs in favor of approving the settlement.  See *Officers for Justice*, 688 F.2d at 626; *Milstein v. Huck*, 600 F.Supp. 254, 267 (E.D.N.Y. 1984) ("The expense and possible duration of the litigation are major factors to be considered in evaluating the reasonableness of this settlement").

### c.    The Risk of Maintaining Class Action Status Throughout Trial

Whether or not the action would have been tried as a class action is also relevant in assessing the fairness of the settlement.  Although the court certified a class for settlement purposes early in the litigation,[100] plaintiffs would have faced significant challenges establishing that individualized driving patterns did not affect the brake pad wear experienced by class members.  This would have impacted whether plaintiffs could have shown that there was commonality under Rule 23(a)(2)  and that common factual questions predominated under Rule 23(b)(3).  See FED.R.CIV.PROC. 23(a)(2) (one prerequisite to certification is a finding that there are questions of fact and law common to the class); *id.*, 23(b)(3) (before a damages class is certified, the court must find that "the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy").  Had the court determined that it was not appropriate to certify a class, unrepresented class members might well have lost their chance to recover from Honda for alleged problems with the braking system.  See *In re Omnivision Technologies, Inc.*, 559 F.Supp.2d 1036, 1041 (N.D. Cal. 2008)

---

[99]Gibbs Decl., ¶ 4.

[100]Prelim. Order at 1.

("If the Court were to refuse certification, the unrepresented potential plaintiffs would likely lose their chance at recovery entirely.  Even if the Court were to certify the class, there is no guarantee the certification would survive through trial, as Defendants might have sought decertification or modification of the class").   Therefore, the court finds that this factor weighs in favor of approving the proposed settlement.

### d.    The Amount Offered in Settlement

As the Ninth Circuit has noted, "it is the very uncertainty of outcome in litigation and avoidance of wasteful and expensive litigation that induce consensual settlements.  The proposed settlement is [thus] not to be judged against a hypothetical or speculative measure of what *might* have been achieved by the negotiators." *Officers for Justice*, 688 F.2d at 625 (emphasis original). Rather, "the very essence of a settlement is compromise, 'a yielding of absolutes and an abandoning of highest hopes.'" *Id.* at 624 (quoting *Cotton v. Hinton*, 559 F.2d 1326, 1330 5th Cir. 1977)).  "'The fact that a proposed settlement may only amount to a fraction of the potential recovery does not, in and of itself, mean that the proposed settlement is grossly inadequate and should be disapproved.'" *Linney,* 151 F.3d at 1242 (quoting *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 455 & n. 2 (2d Cir. 1974)).  Estimates of what constitutes a fair settlement figure are tempered by factors such as the risk of losing at trial, the expense of litigating the case, and the expected delay in recovery (often measured in years).

As noted, the proposed settlement entitles class members to seek reimbursement up to $150 for replacing their brake pads with the new material pads.  The parties estimate that the cost of replacing rear brake pads typically runs between $150 to $170.[101]   Thus, class members should come close to full compensation for the installation of the new material pads, which will presumably last at least as long as the brake pads they would have expected to receive when they purchased or leased a class vehicle.  This aspect of the settlement will allow class members to avoid future expenditures related to premature brake pad wear.

---

[101]Joint Decl., ¶ 25.  Class counsel represented at the fairness hearing that they surveyed the costs charged by repair technicians nationwide to generate this estimate.

Additionally, class members can recover 50 percent of the costs they previously incurred replacing their brake pads with standard or non-Honda pads up to a maximum of $125 per replacement.  Based on class counsel's estimate that standard Honda brake pads in class vehicles last half as long as the brake pads in other Honda models, class members will receive compensation roughly equivalent to the value they lost.[102]  Stated differently, because class counsel estimate that class members received approximately half the amount of use they could have expected from their brake pads, a 50 percent reimbursement puts class members in the same or a more favorable economic position as an owner whose brake pads did not wear out prematurely.

While all class members will be compensated as a result of the settlement, it is possible that some class members experienced faster brake pad wear or higher replacement costs than the parties estimate.  Plaintiffs state, in fact, that many Honda dealerships charged class members for unnecessary rotor resurfacing while replacing their brake pads, causing those consumers to pay increased replacement costs.  Even if charged for additional work such as rotor resurfacing, however, class members can recover 50 percent of the charges up to $125.  At the fairness hearing, class counsel stated that the additional cost of rotor resurfacing that some class members had to pay was the primary reason the parties agreed to raise the maximum reimbursement amount to $125.  Thus, if a class member was charged as much as $250 for replacing the rear brake pads and resurfacing the rotors – well above the estimated cost of brake pad replacement alone – that class member will still be able to recoup 50 percent of his or her costs.

While some class members will not be completely compensated for the expenses they incurred installing the new material pads or the costs they incurred when they had to replace their original brake pads, the compensation provided by the settlement will cover a good portion of the reasonable expenses incurred as a result of the allegedly premature wear of the brake pads.  Further, class members will be able to receive compensation within ten days of submitting a claim, rather than potentially waiting years and incurring additional costs as litigation proceeded.

---

[102]As noted, class counsel reported at the fairness hearing that their investigation showed Honda brake pads in non-class vehicles typically lasted more than 30,000 miles, while Honda brake pads in class vehicles wore out at 15,000 to 20,000 miles.

Finally, the compensation levels represent a compromise reached following extensive arms-length negotiations.  For all these reasons, the court finds that the settlement amount is fair and adequate, and will provide immediate monetary relief to the class.  See *In re Mego Financial Corp. Securities Litigation*, 213 F.3d 454, 459 (9th Cir. 2000) (holding that, given the difficulties inherent in complex securities litigation, one-sixth of the potential recovery was fair and adequate); *Officers for Justice*, 688 F.2d at 628 ("It is well-settled law that a cash settlement amounting to only a fraction of the potential recovery does not per se render the settlement inadequate or unfair"); *Jaffe v. Morgan Stanley & Co.*, No. C 06-3903 TEH, 2008 WL 346417, *9 (N.D. Cal. Feb. 7, 2008) ("The settlement amount could undoubtedly be greater, but it is not obviously deficient, and a sizeable discount is to be expected in exchange for avoiding the uncertainties, risks, and costs that come with litigating a case to trial").

**e.     The Stage of the Proceedings and Extent of Discovery Completed**

"'The extent of discovery may be relevant in determining the adequacy of the parties' knowledge of the case.'"  *NRTC*, 221 F.R.D. at 527 (quoting MANUAL FOR COMPLEX LITIGATION, THIRD, § 30.42 (1995)).  "'A court is more likely to approve a settlement if most of the discovery is completed because it suggests that the parties arrived at a compromise based on a full understanding of the legal and factual issues surrounding the case.'"  *Id*. (quoting 5 W. Moore, MOORE'S FEDERAL PRACTICE, § 23.85[2][e] (Matthew Bender 3d ed.)).  The greater the discovery that has been completed, the more likely it is that the parties have "'a clear view of the strengths and weaknesses of their cases.'"  *Young*, 2007 WL 951821 at *4 (quoting *In re Warner Communications Securities Litigation*, 618 F.Supp. 735, 745 (S.D.N.Y. 1985)).

The parties admittedly engaged in settlement negotiations early in the litigation.  Plaintiffs' counsel state, however, that they expended significant time investigating the nature of the braking system defect that allegedly exists in class vehicles, as well as the extent of damages class members suffered as a result of the alleged defect.[103]  In the course of their investigation, counsel worke with multiple experts, who reviewed the technical aspects of Honda's braking system with

---

[103]Joint Decl., ¶¶ 8–12.

Honda engineers.[104]  Counsel also interviewed roughly 100 potential class members and reviewed the repairs they made to their vehicles.[105]  After Honda suggested potential solutions for the brake pad problem, plaintiffs reviewed testing data that it provided to confirm that the new material pads resolved the wear issue.[106]  Plaintiffs also deposed a senior Honda engineer twice  to explore the technical deficiencies in Honda's braking system and the improvement that the new material pads would provide.[107]  Additionally, plaintiffs propounded requests for admission before agreeing to a final settlement.

While the parties did not take many depositions, "[i]n the context of class action settlements, 'formal discovery is not a necessary ticket to the bargaining table' whe[n] the parties have sufficient information to make an informed decision about settlement." *In re Mego Financial Corp.*, 213 F.3d at 459 (quoting *Linney*, 151 F.3d at 1239).  Here, there is substantial evidence that the parties worked to identify and confirm the technical issues raised by the braking system and to confirm that the new material pads would reasonably resolve class members' complaints.  Class counsel investigated and also conducted formal discovery.  The court therefore concludes that counsel had sufficient information to make an informed decision about the adequacy of the settlement.  This factor, therefore, also weighs in favor of approval of the parties' agreement.

### f.    The Presence of a Governmental Participant

This factor does not apply because no government entities participated in this case.

### g.    The Experience and Views of Counsel

"The recommendations of plaintiffs' counsel should be given a presumption of reasonableness." *Boyd v. Bechtel Corp.*, 485 F.Supp. 610, 622 (N.D. Cal. 1979) (citations omitted).  "Parties represented by competent counsel are better positioned than courts to produce

---

[104]*Id.*, ¶ 13.

[105]*Id.* ¶ 12.

[106]*Id.*, ¶¶ 21–22.

[107]*Id.*

1    a settlement that fairly reflects each party's expected outcome in litigation." *In re Pacific*
2    *Enterprises Securities Litigation*, 47 F.3d 373, 378 (9th Cir. 1995).

3    The class is represented by co-lead counsel, Eric H. Gibbs of Girard Gibbs LLP and
4    Steven N. Berk of Berk Law PLLC. Both counsel have significant experience litigating consumer
5    class action claims, including claims against auto industry defendants.[108] Together, they have
6    negotiated more than thirty court-approved class action settlements.[109] Both attorneys recommend
7    the settlement without reservation, asserting that it provides fair compensation to the class that
8    likely would not be improved through further litigation.[110] The recommendation of experienced
9    class counsel weighs in favor of approval. See *In re Omnivision Techs.*, 559 F.Supp.2d at 1043.
10   Counsel's recommendation, however, must be evaluated in light of "their obvious pecuniary
11   interest in seeing the settlement approved." *Young*, 2007 WL 951821 at *5. Consequently, while
12   this factor favors approval, the court accords it little weight.

13                    **h.    Class Members' Reaction to the Proposed Settlement**

14   In order to gauge the reaction of class members, the court evaluates the number of opt-out
15   requests, as well as the number of objections to the settlement. See *In re General Motors Corp.*
16   *Pick-Up Truck Fuel Tank Prods. Liability Litig.*, 55 F.3d 768, 812 (3rd Cir. 1995) ("In an effort
17   to measure the class's own reaction to the settlement's terms directly, courts look to the number
18   and vociferousness of the objectors"); *Pallas v. Pacific Bell*, No. C-89-2373 DLJ, 1999 WL
19   1209495, *6 (N.D. Cal. July 13, 1999) ("The greater the number of objectors, the heavier the
20   burden on the proponents of settlement to prove fairness"). Information regarding the proposed
21   settlement was mailed to more than 740,000 class members during the week of May 24, 2010.[111]
22   By July 22, 2010, the claims administrator had received more than 39,000 claim forms from class

23

24   ───────────────

25   [108]Gibbs Decl., ¶ 3, Exh. 1; Berk Decl., ¶ 8

26   [109]Joint Decl., ¶ 5.

27   [110]*Id.*

28   [111]Joint Decl., ¶ 27.

members wishing to participate in the settlement.[112]   The administrator also answered more than 3,000 calls for information.  In addition, class counsel received approximately 3,500 calls and 1,500 emails requesting information regarding the settlement.[113]  Only 480 class members have opted out of the proposed settlement;[114] an additional 117 objected to the terms of the settlement, while ten wrote letters of support.[115]

The 480 opt-outs represent .065 percent of eligible class members.  The 117 objectors represent .016 percent of the class.  The comparatively low number of opt-outs and objectors indicates that generally, class members favor the proposed settlement and find it fair. Cf. *Garner v. State Farm Mut. Auto. Ins.*, No. CV 08 1365 CW (EMC), 2010 WL 1687832, *15 (N.D. Cal. April 22, 2010) (finding that an opt-out rate of 0.4 percent supported "the fairness of the Settlement"); *Mangone v. First USA Bank*, 206 F.R.D. 222, 227 (S.D. Ill. 2001) (finding that an opt-out rate of 0.10614 percent and an objection rate of 0.0052 percent represented "overwhelming support" for the settlement by class members and "strong circumstantial evidence supporting the fairness of the Settlement"). See also *Churchill Vill., LLC v. Gen. Elec.*, 361 F.3d 566, 577 (9th Cir. 2004) (affirming approval of a class action settlement where 90,000 class members received notice, and 45 objections were received); *In re Austrian and German Bank Holocaust Litig.*, 80 F.Supp.2d 164, 175 (S.D.N.Y. 2000) (finding a small number of objectors "indicative of the adequacy of the settlement").

The fact that 5 percent of class members have already submitted claims for compensation, and the comparatively low rate of opt-outs and objectors indicate that class members have reacted positively to the settlement. See *Rodriguez v. West Publ'g Corp.*, 563 F.3d 948, 967 (9th Cir.

---

[112]Supplement at 1.

[113]Sup. Stein Decl., ¶¶ 4–5.  The claims administrator reported that 3,577 class members received information regarding the settlement through the automated toll-free number, and that there have been 26,358 unique visitors to the settlement website.  (*Id.*, ¶ 5.)

[114]Supplement at 1 (noting that 521 class members originally opted out, but 41 withdrew their request for exclusion after receiving notice of the modification to the settlement agreement).

[115]Class counsel reported receiving 105 objections.  (*Id.*, ¶ 9.)

2009) ("The court had discretion to find a favorable reaction to the settlement among class members given that, of 376,301 putative class members to whom notice of the settlement had been sent, 52,000 submitted claims forms and only fifty-four submitted objections [0.014 percent]").

When considering class members' objections, however, the district court must evaluate whether they identify reasons why the proposed settlement may be unfair. See *Bennett v. Behring Corp.*, 737 F.2d 982, 988 (11th Cir. 1984) (affirming approval of a class settlement despite significant objections from class members because "the reasons for that opposition [were] thoroughly considered and ultimately rejected by the district court"); *Californians for Disability Rights, Inc. v. Cal. DOT*, No. C 06-5125 SBA, 2010 WL 2228531, *2 (N.D. Cal. June 2, 2010) ("If objections are filed, the district court is to evaluate whether they suggest serious reasons why the settlement proposal might be unfair"); *Boyle v. Arnold-Williams*, No. C01-5687JKA, 2006 U.S. Dist. Lexis 91920, *10–11 (W.D. Wash. Dec. 20, 2006) ("[T]he fact that there is opposition does not necessitate disapproval of the settlement. Instead, the court must independently evaluate whether the objections being raised suggest serious reasons why the proposal might be unfair").

The objectors raise four complaints: (1) that the settlement does not compensate class members who replaced their brakes with non-Honda parts; (2) that the settlement does not cover the full cost of replacing the rear brake pads and related parts; (3) that the settlement does not cover future replacement or repair of brake pads and related parts; and (4) that the structure of the settlement will deprive certain class members of the full value of their existing brake pads. The court considers each objection in turn.

### i.    Owners Who Replaced Their Brakes Using Non-Honda Parts

The largest number of objections – 57 of 117 or 49 percent – concerned the fact that the original settlement terms excluded any reimbursement for class members who replaced the brakes pads on their vehicle with non-Honda or aftermarket parts. These class members contend that they are being penalized for their unwillingness to replace defective Honda brake pads with the

same flawed parts.[116]   In response to these complaints, the parties amended the settlement agreement to allow class members who replaced their original defective brake pads with non-Honda parts to receive compensation for one such replacement.[117]   Class members will now be compensated for 50 percent of the cost of replacing their rear Honda brake pads with non-Honda brake pads up to $125.   This is the same rate of compensation afforded class members who replaced their rear brakes with Honda parts.   Although class members who replaced the brake pads with non-Honda parts will only be compensated for one replacement, none of the objectors states that he or she has had to replace non-Honda brake pads multiple times.   Class counsel, moreover, is not aware of instances in which this has occurred.[118]   Consequently, the court concludes that this limitation will not seriously limit the rights of class members who elected to replace using non-Honda parts and that the objections of class members concerning reimbursement for non-Honda parts have largely been addressed.

### ii.   Settlement Insufficient to Cover Full Replacement Cost

The second most common objection, asserted by 55 class members, is that the cash reimbursement afforded by the settlement will not cover the full cost of a brake pad replacement. These objectors contend that the two types of reimbursement being offered – (1) the lesser of $125 or 50 percent of the amount paid to replace the standard brake pads, and (2) the lesser of $150 or the amount paid for the installation of new material pads – do not fairly compensate owners for the total costs they incurred fixing their brakes.   Many objectors cite labor costs and/or the cost

---

[116]While the complaint alleged that excessive pressure applied by Honda's braking system caused the rear brake pads to wear out prematurely, class counsel noted at the fairness hearing that the quality of the standard pads contributed to the need for early replacement as well.   Thus, the parties have agreed that installation of brake pads that are more resistant to pressure, as well as an adjustment to the vehicle's calipers, will address the problem.   Honda contends that, as a result of these modifications, the new material brake pads will last as long as the brake pads on earlier model year Honda vehicles.   (Motion at 5).

[117]Reply at 1.

[118]At the fairness hearing, class counsel stated they did not know of any class member whose non-Honda brake pads were wearing at the rate of the standard Honda brake pads.

of replacing or resurfacing brake rotors as the reason why the settlement compensation is insufficient.[119]

Under the settlement, owners who replace their brakes with new material pads will be fully compensated for all brake pad-related expenses, including labor and rotor resurfacing, up to a maximum of $150.[120]  The parties state that, following investigation, they believe the national average cost of rear brake pad replacement, including labor, is $150 to $170.[121]  Honda has agreed to freeze the retail price for the new material pads at $66.66 for one year and not to increase the price by more than five percent for the next two years.[122]  The price of labor required to install new material pads obviously varies by location and facility.  The costs quoted by Honda service departments appear to be among the highest.[123]  Given, however, Honda's willingness to reimburse class members up to $150, and the limits placed on the retail price of the new pads, the settlement permits class members to seek out third-party technicians whose labor costs, coupled with the price of the new material brake pads, will approximate the amount available under the proposed settlement.  While not all class members will receive full compensation for the cost of installing the new material brake pads, the court concludes that this aspect of the settlement represents a fair compromise.

Class members who have replaced previously their brake pads will be reimbursed at 50

---

[119]Thirteen objectors discussed high labor costs, while twenty-two noted the cost of replacing or resurfacing brake rotors as a result of premature brake pad wear.  Gary Forman of Tuxedo Park, New York, for example, stated that "[t]he proposed settlement obviously affords no compensation for [rotor] expense[s], and does not even appear to take into account the ancillary damage caused by the defective pads to the rear brake rotors."

[120]Settlement Agreement at 11.

[121]Joint Decl., ¶ 25.

[122]Settlement Agreement at 12.

[123]Honda's counsel noted at the fairness hearing that Honda cannot control the service rates charged by its dealers, and that charges often vary depending on the number of dealers in a particular geographic area.

percent of the amount paid up to $125.  This includes labor costs and rotor resurfacing.[124]  Class members are being reimbursed for 50 percent of the costs they incurred replacing the original brake pads because the original pads allegedly lasted approximately half as long as the pads on 2003–2007 Accords and Acuras.[125]  Because class members received approximately half the use they expected from their brake pads, a 50 percent reimbursement puts them in the same or a more favorable position as an owner whose brake pads did not wear prematurely.[126]  For this reason, despite the objectors' argument that they should be fully reimbursed, the court finds that this aspect of the proposed settlement is fair.

Many owners incurred additional costs because technicians  told them that the rotors on their vehicles needed resurfacing or replacement in connection with the brake pad replacement. The costs associated with rotor resurfacing or replacement generally exceeded the $150 to $170 cited by counsel as the cost of a brake pad replacement.  Although rotor repairs may represent an additional cost, they are covered up to the maximum of $125 or $150.[127]  Indeed, class counsel indicated that the additional cost for rotor resurfacing that some class members paid was the primary factor that led the parties to increase the maximum reimbursement for prior brake pad replacements to $125.  To prevent such unnecessary costs in connection with the installation of the new material pads, Honda has also issued a "Service News" bulletin to dealers, service technicians, class members, and third-party technicians in order to "discourage unnecessary services or repairs to the Class Vehicles' Rear Braking System, including the unnecessary

---

[124]Reply at 6 ("[T]he compensation offered for past repairs . . . cover[s] out-of-pocket expenses for brake rotor resurfacing and caliper adjustment performed in connection with a rear brake pad replacement," citing Settlement Agreement at 8–9, 11).

[125]Reply at 5.

[126]*Id.*

[127]Reply at 6; Settlement Agreement at 9 (explaining that all repairs to the Rear Braking System, defined as the "Class Vehicles' rear brake pads, rotors, and caliper," are covered by the settlement).

resurfacing of rotors."[128]   The parties hope that, as a result of this notification, future costs for rotor repair will be minimal.   There is no evidence that class members commonly suffered extensive damage to their rotors.   Rather, it appears that some class members were induced to resurface or replace the rotors by Honda dealers or third-party technicians.   There is no evidence that class members generally authorized such repairs, such that the failure to increase the maximum amount available for reimbursement renders the settlement unfair.   This objection, therefore, does not persuade the court that it should not approve the settlement.

### iii.   Settlement Fails to Cover the Cost of Future Brake Pad Replacements

Twenty-four objectors complain that the settlement will not compensate owners for the cost of future brake repairs.   Many of these objectors fear that their vehicle will need new brake pads every 15,000 to 20,000 miles for the life of the car.[129]   Plaintiffs argue, however, that the installation of the new material brake pads and the suggested adjustments to the vehicles' calipers will "allow the rear brake pads to last as long as the brake pads in the 2003–2007 Honda Accords."[130]   If class members have the new material pads installed within the settlement period, therefore, their vehicles should no longer experience premature brake pad wear, and they will find themselves in the same position as other Honda vehicle owners.

### iv.   Certain Class Members Will Not Receive Full Value from Their Current Brakes Pads

Twenty-eight objectors complain that they will be unable to obtain full value from their existing brake pads under the proposed settlement.   Some are owners/lessees of low-mileage

---

[128]Settlement Agreement at 12–13; Reply at 7 (stating that Honda has already issued a Service News article notifying service technicians that rotor resurfacing "should be rare").

[129]For example, David Cocos of League City, Texas writes: "I am likely to suffer the expense and inconvenience caused by premature brake failure and replacement many times over during a normal life-span of this car."

[130]Reply at 7.

vehicles that will not need a brake pad replacement during the settlement period[131] – i.e., the later of three years from the date of purchase or ninety days from final approval of the settlement. Others contend that they purchased standard brake pads before the new material pads became available.[132] Class members in this second category object to installing the new material pads after only one or two months' use of their existing pads to obtain reimbursement within the settlement period. Both sets of class members will need to replace their brake pads with new material pads before their existing pads have entirely worn out.

Under the terms of the settlement, class members can take their vehicles to any technician to have the new material brake pads installed and receive reimbursement for their expenses up to $150. Alternatively, they can opt out of the settlement and/or forego the $150 brake pad reimbursement. While early replacement may inconvenience some class members, the 3-year time limitation ensures that the class's legal claims fall within Honda's 3-year/36,000-mile warranty period.[133] Additionally, the time limitation on the settlement affects only a small percentage of class members who either recently replaced their brake pads and are at the end of their warranty period, or who drive their vehicles infrequently and have low mileage. These objections, therefore, do not convince the court that the settlement is unfair.

v.    **Conclusion Regarding Class Member Reactions to the Proposed Settlement**

The low percentage of opt-outs and objections, and the large number of class members who have filed claims seeking compensation under the terms of the settlement, indicate that class members largely favor the proposed settlement and find it fair. See *Rodriguez*, 563 F.3d at 967.

---

[131]Class member William Stout of Bel Air, Maryland, for example, has only 5,756 miles on his 2008 Honda Accord, and is worried the "brakes on his car would not be expected to fail until sometime after the 3-year settlement window leaving me with no right to claim compensation for replacement."

[132]For example, Lynn Hendrickson of Congers, New York replaced her brake pads with standard pads one day before receiving notice of settlement.

[133]Reply at 8–9.

For the reasons discussed, moreover, the objections raised by class members do not cause the court to conclude that the settlement is unfair. While the proposed settlement does not perfectly compensate every member of the class, it is unlikely that any settlement of the claims of a class of more than 740,000 members would achieve such a result. Despite the reasonable concerns raised by the objectors, the settlement represents a compromise that fairly compensates class members who chose to remain in the class. See *Hanlon*, 150 F.3d at 1027 ("Settlement is the offspring of compromise; the question we address is not whether the final product could be prettier, smarter or snazzier, but whether it is fair, adequate and free from collusion. In this regard, the fact that the overwhelming majority of the class willingly approved the offer and stayed in the class presents at least some objective positive commentary as to its fairness. There was no disparate treatment between class members; all stood to benefit equally, a fact which lessens the likelihood that the named plaintiffs and their attorneys colluded with Chrysler to increase their own recovery at the expense of the unnamed plaintiffs who class counsel had a duty to represent. No objector stepped forward and suggested that his or her personal claim was being sacrificed for the greater good – and if any thought that was the case, they had the right to opt-out of the class").

### i.    Other Factors

As noted, the *Young* court considered two additional factors: the procedure by which the settlement was reached and the involvement of the named plaintiffs in the process. The parties here reached agreement after intensive arms-length negotiations over a period of months, including a mediated conference with the court.[134] It does not appear, however, that class representatives were substantively involved in this process. Accordingly, this factor is neutral.

### j.    Balancing the Factors

"Ultimately, the district court's determination [regarding the fairness and adequacy of a proposed settlement] is nothing more than an amalgam of delicate balancing, gross approximations and rough justice." *Officers for Justice*, 688 F.2d at 625 (citation omitted). "[I]t must not be

---

[134]Joint Decl., ¶¶ 11–22.

overlooked that voluntary conciliation and settlement are the preferred means of dispute resolution.  This is especially true in complex class action litigation." *Id.*  Having considered the relevant factors, the court concludes that the circumstances surrounding the settlement weigh in favor of a finding that it is fair and adequate.  Accordingly, the court approves it.

### III.     CONCLUSION

For the foregoing reasons, the court grants the parties' joint motion for final approval of the settlement agreement.

DATED: July 29, 2010

_____
MARGARET M. MORROW
UNITED STATES DISTRICT JUDGE

**EXHIBIT A**

**U.S. DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**
*Browne, et al. v. American Honda Motor Co., Inc.*

**<u>NOTICE OF CLASS SETTLEMENT</u>**: On July 29, 2010, the court granted final approval of the settlement described in the Notice of Honda and Acura Rear Brake Pad Settlement.  Class members may now file claims for reimbursement, as the "Effective Date" of the settlement is July 29, 2010.

**<u>INCREASE IN BENEFITS</u>**: In addition to the reimbursements described in the original Notice, class members who paid for a rear brake pad replacement using **non-Honda or non-Acura rear brake pads** can now claim **50%** of their costs for **<u>one</u>** such repair, up to **$125**.  The claim form can be found at the websites below.  The processing time for claims involving non-Honda or non-Acura pads may exceed 10 days.

To read the Notice, get a Claim Form, or for answers to FAQs visit www.AccordSetttlement.com & www.GirardGibbs.com/HondaBrakes.asp
        You can also contact the Claims Administrator at (888) 398-8211.

**EXHIBIT B**

**UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA**

*Browne et al. v. American Honda Motor Co., Inc., Case No. 09-CV-06750-MM*

**A federal court authorized this notice.  This is not a solicitation from a lawyer.**

## Notice of Change to Settlement in Honda and Acura Rear Brake Pad Class Action

Dear :

On July 29, 2010, U.S. District Court Judge Margaret M. Morrow granted final approval of the settlement in the Honda and Acura Rear Brake Pad Class Action, with one change to the proposed settlement previously outlined in the original notice to the class. If otherwise eligible for reimbursement, class members who paid to replace their rear brake pads with **non-Honda or non-Acura brake pads** will now be eligible to claim reimbursement for **50%** of their costs for **one** such repair, up to **$125**.  The processing time for claims involving non-Honda or non-Acura pads may exceed 10 days.

You are receiving this notice because you excluded yourself from the settlement. In granting final approval, the court has allowed you additional time to consider whether to participate in the settlement.  If you wish to participate in the settlement, you may withdraw your exclusion request by sending your full name, address, telephone number, model year and vehicle identification number (VIN), emailed or postmarked no later than **October 5, 2010**, to ds@girardgibbs.com or by mail to:

Girard Gibbs LLP
c/o Honda Settlement Exclusion Withdrawal
601 California Street, Suite 1400
San Francisco, CA  94108

If you wish to remain excluded from the settlement, it is not necessary to take any further action at this time.  If you remain excluded, you will be ineligible for reimbursements but will preserve your legal rights.

If you have any questions about this letter, your eligibility to participate in the settlement, or the settlement generally, please feel free to contact Class Counsel at 1-866-981-4800.  In addition, answers to frequently asked questions are available at www.accordsettlement.com or www.GirardGibbs.com/HondaBrakes.asp.