1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

E-Filed: 10.05.10

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| VANESSA BROWNE and PAUL MOORE, on behalf of themselves and all others similarly situated, ) ) ) ) | CASE NO. CV 09-06750 MMM (DTBx) |
| Plaintiffs, ) ) | ORDER APPROVING ATTORNEYS' FEES AND INCENTIVE AWARDS |
| vs. ) ) | |
| AMERICAN HONDA MOTOR CO., INC., ) ) ) | |
| Defendant. ) ) | |

Plaintiffs Vanessa Browne and Paul Moore filed this putative class action on September 16, 2009, alleging a defect in the braking systems on certain vehicles sold by defendant American Honda Motor Company, Inc.[1] Following a fairness hearing on July 26, 2010, the court approved the class settlement proposed by the parties.[2] In conjunction with approval of the proposed settlement, plaintiffs also moved for approval of the attorneys' fees and class representative

---

[1]Complaint, Docket No. 1 (Sept. 16, 2009). A first amended complaint was filed January 14, 2010. (First Amended Complaint, Docket No. 6 (Nov. 24, 2008)).

[2]Order Approving Final Settlement, Docket No. 55 (July 29, 2010).

incentive awards to which Honda agreed as part of the settlement.[3]   The court addresses this motion separately from its prior approval of the class settlement.

## I.  FACTUAL BACKGROUND

### A.      The Parties, the Complaint, and the Class Settlement

The class includes roughly 750,000 residents of the United States, the Commonwealth of Puerto Rico, U.S. Virgin Islands, and Guam who currently own or lease specific Honda vehicles: 2008 and 2009 model year Honda Accord automobiles; 2009 model year Acura TSX automobiles; certain 2010 model year Honda Accord automobiles that plaintiffs have identified by their vehicle identification numbers; and certain 2010 model year Acura TSX automobiles that plaintiffs have identified by their vehicle identification numbers ("class vehicles").[4]  Defendant American Honda Motor Company, Inc. ("Honda") is the U.S. sales, marketing, and distribution subsidiary of Honda Motor Co., Ltd., which manufactures the class vehicles.[5]

Plaintiffs' complaint alleges that the braking system used in the class vehicles suffers from

---

[3]Memorandum in Support of Motion for Attorneys' Fees ("Fees Motion"), Docket No. 46 (June 21, 2010); Declaration of Eric H. Gibbs ("Gibbs Decl"), Docket No. 43 (June 21, 2010); Declaration of Steven N. Berk ("Berk Decl."), Docket No. 45 (June 21, 2010).  See also Declaration of Eric H. Gibbs and Steven N. Berk in Support of Final Approval of Class Settlement ("Joint Decl."), Docket No. 42 (June 21, 2010); Declaration of David Stein in Support of Final Approval of Class Settlement ("Stein Decl."), Docket No. 44 (June 21, 2010).  After the fairness hearing, plaintiffs submitted additional information requested by the court to support the amount of attorneys' fees sought.  (See Supplemental Declaration of Steven Berk ("Supp. Berk Decl."), Docket No. 56 (Aug. 6, 2010); Supplemental Declaration of Eric Gibbs ("Supp. Gibbs Decl."), Docket No. 57 (Aug. 6, 2010).)

[4]Prelim. Order at 1.  Plaintiffs' counsel have identified the affected 2010 model year vehicles by VIN number at http://www.girardgibbs.com/hondabrakes.asp.  Excluded from the class are Honda, Honda's employees, employees of Honda's affiliated companies, Honda's officers and directors, Honda's counsel, insurers of class vehicles, all entities claiming to be subrogated to the rights of class members, issuers of extended vehicle warranties, and the Judge(s) to whom the litigation is or will be assigned.  (Id.)

[5]First Amended Complaint, ¶ 6.

2

a defect that causes excessive force to be applied to the vehicles' rear wheels.[6]  As a result, plaintiffs contend that Honda's standard-issue rear brake pads ("standard pads") wear out prematurely, requiring replacement roughly every 15,000 to 20,000 miles.  Plaintiffs argue that this rate of replacement is far more frequent than what is normal for an automobile's rear brake pads.[7]

Class representative Vanessa Browne purchased a new 2008 Honda Accord sedan in January 2009.[8]  She alleges that six months and less than 18,000 miles later, her rear brake pads required replacement.[9]  After a Honda technician at the dealership where she purchased the car quoted a replacement price of $325, Browne paid a third-party technician $160 to replace the rear brake pads.[10]  Class representative Paul Moore was forced to replace the rear brake pads on his 2008 Accord nine months and 15,000 miles after having purchased the car new.[11]

After receiving complaints from other Honda customers, plaintiffs' counsel Steven N. Berk of Berk Law PLLC began to investigate the premature wear of the brake pads in August 2009.[12]  Thereafter, he and co-counsel Eric H. Gibbs of Girard Gibbs LLP filed a complaint on September 16, 2009.[13]  Believing that Honda owners would benefit from notice and an early resolution of the problem, class counsel contacted Honda not long after the action commenced to assess whether

---

[6]*Id.*, ¶¶ 1, 15.

[7]In their complaint, plaintiffs alleged that rear brake pads typically last for 70,000 miles or more.  (*Id.*)  At the fairness hearing, however, plaintiffs' counsel indicated their subsequent investigation showed Honda brake pads on non-class vehicles typically last just over 30,000 miles.

[8]*Id.*, ¶ 24.

[9]*Id.*, ¶ 25.

[10]*Id.*, ¶ 26.

[11]*Id.*, ¶¶ 30–34.

[12]Joint Decl., ¶¶ 8–9; Supp. Berk Decl., ¶ 5.

[13]Joint Decl., ¶¶ 8–9; Supp. Berk Decl., ¶ 5.

1 an early settlement would be possible.[14] After several months of negotiation, the parties agreed

2 to a settlement on March 4, 2010 pursuant to which Honda agreed to reimburse class members

3 for costs associated with replacing their rear brake pads.[15] The court granted final approval of the

4 class settlement on July 29, 2010.[16]

5     **B.**  **Negotiations Regarding Attorneys' Fees, Costs, and Incentive Awards**

6    The parties purposefully did not discuss attorneys' fees, costs, or incentive awards for the

7 class representatives until early 2010, after an initial settlement on the merits had been reached.[17]

8 After unsuccessful attempts to negotiate an agreement on these issues, the parties engaged the

9 Honorable Edward A. Infante (Ret.) to conduct a mediation.[18] As a result of the mediation,

10 Honda agreed not to oppose a request by plaintiffs' counsel for attorneys' fees and costs of $2

11 million and incentive awards of $1,000 to each class representative. These amounts will be paid

12 by Honda and will not affect the recovery of the class.[19]

13

14             **II.  DISCUSSION**

15    **A.**  **Legal Standard Governing Awards of Attorneys' Fees**

16    The procedure for requesting attorneys' fees is set forth in Rule 54(d)(2) of the Federal

17 Rules of Civil Procedure. While the rule specifies that requests shall be made by motion "unless

18 the substantive law governing the action provides for the recovery of . . . fees as an element of

19 damages to be proved at trial," the rule does not itself authorize the awarding of fees.  "Rather,

20

21    [14]Joint Decl., ¶¶ 10–11.

22    [15]*Id.*, Exh. 1 ("Settlement Agreement").  See also Affidavit of Roy M. Brisbois Re

23 Addendum to Master Settlement Agreement ("Brisbois Decl."), Docket No. 47 (July 12, 2010), Exh. A ("Settlement Addendum").

24

25    [16]Order Approving Final Settlement.

    [17]Joint Decl., ¶ 23.

26

27    [18]*Id.*

28    [19]*Id.*

1  [Rule 54(d)(2)] and the accompanying advisory committee comment recognize that there must be

2  another source of authority for such an award . . . [in order to] give[ ] effect to the 'American

3  Rule' that each party must bear its own attorneys' fees in the absence of a rule, statute or contract

4  authorizing such an award." *MRO Communications, Inc. v. AT&T*, 197 F.3d 1276, 1281 (9th

5  Cir. 1999).

6       In class actions, statutory provisions and the common fund exception to the "American

7  Rule" provide authority for awarding attorneys' fees.[20]   See ALBA CONTE AND HERBERT B.

8  NEWBERG, NEWBERG ON CLASS ACTIONS, § 14.1 (4th ed. 2005) ("Two significant exceptions [to

9  the "American Rule"] are statutory fee-shifting provisions and the equitable common-fund

10  doctrine").  Valid contractual provisions providing for the payment of attorneys' fees also provide

11  a basis for awarding fees. *Alyeska Pipeline Service Co. v. Wilderness Society*, 421 U.S. 240, 257

12  (1975) ("[A]bsent statute or enforceable contract, litigants pay their own attorneys' fees");

13  *Kyocera Corp v. Prudential-Bache Trade Serv., Inc.*, 299 F.3d 769, 793 (9th Cir. 2002) ("Absent

14  statute or enforceable contract, litigants pay their own attorneys' fees"); *MRO*, 197 F.3d at 1281

15  ("[E]ach party must bear its own attorneys' fees in the absence of a rule, statute or contract

16  authorizing such an award").

17       The parties negotiated a settlement agreement that specifically provided for an award of

18  fees and costs.  A settlement agreement is a binding contract.  See, e.g., *Janneh v. GAP Corp.*,

19  887 F.2d 432, 436 (2d Cir. 1989), abrogated on other grounds by *Digital Equip. Corp. v. Desktop

20  *Direct, Inc.*, 511 U.S. 863, 867 (1994); *D.R. by M.R. v. East Brunswick Bd. of Educ.*, 838

21  F.Supp. 184, 189 (D.N.J. 1993) ("It is well settled that settlement agreements . . . form a contract

22  between parties.  Plaintiff asserts that because the Agreement was reached during mediation it is

23  not a binding resolution of a lawsuit.  The Court concurs with the Administrative Law Judge that

24  such an assertion is not backed by either case law or logic," citing *Nolan v. Lee Ho*, 120 N.J. 465,

25

26

27       [20]The common fund exception describes courts' recognition that attorneys' fees may be
collected from a fund preserved, protected, collected or realized by attorneys' efforts on behalf
28  of the class of persons benefitted by or entitled to the fund.  See 38 A.L.R.3d 1384, §4(a) & (b).

472 (1990)); see also *Thomas v. Louisiana*, 534 F.2d 613, 615 (5th Cir. 1976) ("Settlement agreements have always been a favorable means of resolving disputes. When fairly arrived at and properly entered into, they are generally viewed as binding, final, and as conclusive of rights as a judgment").

### B.   Evaluation of the Negotiated Attorneys' Fee Award

While Honda does not dispute its contractual agreement to pay fees, the court must nonetheless evaluate the reasonableness of the award.

### 1.   The Court's Authority to Evaluate Class Counsel's Requested Fees In Light of the Parties' Binding Settlement Agreement

Under normal circumstances, once it is established that a party is entitled to attorneys' fees, "[i]t remains for the district court to determine what fee is 'reasonable.'" *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983). "The fact that the fee award does not come out of a common fund does not eliminate the need for careful [judicial] review." *Duhaime v. John Hancock Mut. Life Ins. Co.*, 989 F.Supp. 375, 377 (D. Mass. 1997).

The settlement agreement in this case contains what is known as a "clear sailing" fee provision. "A clear sailing agreement is one where the party paying the fee agrees not to contest the amount to be awarded by the fee-setting court so long as the award falls beneath a negotiated ceiling." *Weinberger v. Great Northern Nekoosa Corp.*, 925 F.2d 518, 520 n. 1 (1st Cir. 1991). The term has been applied both to contract provisions that specify a particular maximum fee amount, see *BTZ, Inc. v. Great Northern Nekoosa Corp.*, 47 F.3d 463, 465 (1st Cir. 1995) ("GPC-Great Northern, in turn, [agreed to] 'pay the plaintiffs' attorneys' fees and expenses [up to $2 million]"), and to more general provisions that obligate defendants not to contest plaintiffs' fee request, see *Waters v. Int'l Precious Metals Corp.*, 190 F.3d 1291, 1292-93 (11th Cir. 1999) ("Finally, the stipulation included a 'clear-sailing' agreement which provided that 'Defendants will not directly or indirectly oppose Plaintiff's Class Counsel of Record's application for fees and expenses and compensation of the Representative Plaintiffs'").

When presented with a clear sailing provision, "the district court should ordinarily exercise its equity jurisdiction and entertain the application [for attorneys' fees]." "[R]ather than merely

1   rubber-stamping the [fee] request," however, "the court should scrutinize it to ensure that the fees

2   awarded are fair and reasonable." *Weinberger*, 925 F.2d at 520; see also *Nienaber v. Citibank*

3   *(South Dakota) N.A.*, CV-04-4054, 2007 WL 2003761, *2 (D.S.D. July 5, 2007) ("A district

4   court must determine the reasonableness of attorney fee requests notwithstanding the fact that such

5   fees are subject to a clear sailing fee agreement and notwithstanding the fact that the source of

6   payment for the attorney fees does not directly impair the class recovery," citing *Duhaime*).

7        Although "such agreements are sometimes included in class action settlements so that

8   defendants have a more definite idea of their total exposure," *Waters*, 190 F.3d at 1293 n. 3

9   (citing *Weinberger*), courts have explained that "[c]lear sailing clauses can breed circumstances

10  ripe for conflicts of interest between the members of the plaintiff class and counsel for the

11  plaintiffs," since "[t]here is the possibility that the plaintiffs' 'lawyers might urge a class

12  settlement at a low figure or on less-than optimal basis in exchange for red carpet treatment on

13  fees,'" *Stokes v. Saga Int'l Holidays, Ltd.*, 376 F.Supp.2d 86, 90 (D. Mass. 2005) (quoting

14  *Duhaime*, 989 F.Supp. at 377, which cited *Weinberger*, 925 F.2d at 524).   See also *In re*

15  *Fleet/Norstar Sec. Litig.*, 935 F.Supp. 99, 104 (D.R.I. 1996) ("The absence of adversity makes

16  heightened judicial oversight of both of these fee agreements highly desirable, especially since the

17  very existence of a clear sailing agreement increases the likelihood that something of value will

18  have been bargained away by counsel," citing *Weinberger*).

19       Where, as here, the attorneys' fees agreement is negotiated in tandem with and/or

20  incorporated into a settlement agreement resolving the parties' substantive dispute, there is a

21  "danger of conflict. . . ." *Stokes*, 376 F.Supp.2d at 90.  See also *Weinberger*, 925 F.2d at 524

22  (noting courts' concern "that class actions will prove less beneficial to class members than to their

23  attorneys" given, *inter alia*, "the tension which necessarily arises between class members and

24  class counsel when settlements and attorneys' fees are negotiated simultaneously," and stating that,

25  "[w]hile the conflict between a class and its attorneys may be most stark where a common fund

26  is created and the fee award comes out of, and thus directly reduces, the class recovery, there is

27  also a conflict inherent in cases like this one, where fees are paid by a quondam adversary from

28  its own funds – the danger being that the lawyers might urge a class settlement at a low figure or

on a less-than-optimal basis in exchange for red-carpet treatment on fees"). Cf. *Turner v. Murphy Oil USA, Inc.*, 472 F.Supp.2d 830, 845 (E.D. La. 2007) ("In class actions where the attorneys' fees [are] negotiated by counsel, courts 'must be particularly vigilant is evaluating [class counsel's] recommendations because there may be a bias toward settlements in which the class attorney agrees to trade off a smaller total award by the defendant for a larger fee.' . . . Pecuniary self-interest of class counsel has long been cited by courts and scholars as a threat to performance of counsel's professional and fiduciary obligations to class members. . . . The proposed settlement before this Court is unique, however, in that not only are attorneys' fees and expenses to be paid by Murphy over and above the class recovery, but the amount of the fee is left entirely to the Court's discretion. As previously noted, this is significant because it exponentially decreases the possibility of collusion among counsel. Because the parties have not agreed to an amount or even a range of attorneys' fees, and have placed the matter entirely into the Court's hands for determination, there is no threat of the issue explicitly tainting the fairness of settlement bargaining").

In addition to concern regarding potential conflicts of interest, close judicial scrutiny of clear sailing fee agreements is appropriate given "the 'precedential value' set by the award for future class action settlements." *Id.* (citing *Weinberger*, 925 F.2d at 526, and *Duhaime*, 989 F.Supp. at 379). "When . . . a court is compelled by the nature of the case or statutory mandate to award attorney fees to a party, the determination of such award is not only a matter of public record, it becomes part of the great body of our law. A court would be shirking its responsibility to render a principled decision were it to accept without scrutiny and close examination the fees agreed upon by client and counsel." *Id.* (quoting *Codex Corp. v. Milgo Elec. Corp.*, 717 F.2d 622, 632 (1st Cir. 1983), cert. denied *sub nom Milgo Elec. Corp. v. Codex Corp.*, 466 U.S. 931 (1984)). See also *Duhaime*, 989 F.Supp. at 379 ("[T]he proportionality of the fee to the relief actually accruing to the class is an equally important consideration in assessing the reasonableness of the fee award in the present case, because it is that relationship that litigants in future cases will look to in structuring their own arrangements regarding attorneys' fees. . . . Because any award has the potential for 'precedential value' in future cases, the Court owes a duty to the principled

development of the law to exercise careful judgment in reviewing agreed-upon fees," citing *Weinberger*, 925 F.2d at 526).

"Clear sailing agreements can also engender 'potential public misunderstandings' with regard to the class counsel." *Stokes*, 376 F.Supp.2d at 91 (citing *In re Agent Orange Prod. Liab. Litig.*, 818 F.2d 216, 225 (2d Cir. 1987), cert. denied *sub nom Newton B. Schwartz, P.C. v. Dean*, 484 U.S. 926 (1987), and *In re General Motors Corp. Pick-Up Truck Fuel Tank Prod. Liab. Litig.*, 55 F.3d 768, 820 (3d Cir. 1995), cert. denied *sub nom General Motors Corp. v. French*, 516 U.S. 824 (1995)).

Thus, irrespective of the terms of the settlement agreement itself, the court must carefully scrutinize class counsel's requested fee award to determine if it is reasonable. Because plaintiff's immediate right to seek attorneys' fees and costs is based on the settlement agreement, which has a choice of law provision designating California law,[21] and because three of plaintiffs' four causes of action are state law claims, the court will apply that state's California law in evaluating the reasonableness of the requested fees. See *Mangold v. California Pub. Utils. Comm'n*, 67 F.3d 1470, 1478 (9th Cir. 1995) ("Existing Ninth Circuit precedent has applied state law in determining not only the right to fees, but also in the method of calculating the fees," citing *Kern Oil and Refining Co. v. Tenneco Oil Co.*, 792 F.2d 1380 (9th Cir. 1986)).[22]

### 2.   Whether Class Counsel's Requested Fees are Reasonable

"[T]he fee setting inquiry in California ordinarily begins with the 'lodestar,' i.e., the number of hours reasonably expended multiplied by the reasonable hourly rate." *PLCM Group v. Drexler*, 22 Cal.4th 1084, 1095 (2000). "The reasonable hourly rate is that prevailing in the community for similar work." *Id.* (citing *Margolin v. Reg'l Planning Comm'n*, 134 Cal.App.3d

---

[21]Settlement Agreement at 24–25.

[22]In addition to three state law causes of action, plaintiffs here pled a claim for breach of written warranty under the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301 et seq. The parties' settlement agreement resolves all claims, including the federal cause of action. Similarly, in *Mangold*, plaintiffs prevailed on both federal and state claims and the trial court awarded fees under state law.

999, 1004 (1982)).  The lodestar may by adjusted upward or downward "by the court based on factors including . . . (1) the novelty and difficulty of the questions involved, (2) the skill displayed in presenting them, (3) the extent to which the nature of the litigation precluded other employment by the attorneys, (4) the contingent nature of the fee award." *Ketchum v. Moses*, 24 Cal.4th 1122, 1132 (2001).  The purpose of adjusting the lodestar is to fix the fee for the action in question at fair market value.  *Id.*[23]

Class counsel argue that the fees reflected in the settlement agreement are well within the parameters established by cases utilizing a lodestar methodology.[24]  Based on the number of hours billed and their hourly rates, plaintiffs' counsel calculate an initial lodestar of $1,376,894.55.[25] They assert that a multiplier of 1.4 should be applied to this amount, generating a final fee amount

_____

[23]Federal law uses a similar approach.  The court calculates the lodestar by multiplying the number of hours reasonably expended on the litigation by a reasonable hourly rate.  See *Fischer v. SJB-P.D. Inc.*, 214 F.3d 1115, 1119 (9th Cir. 2000) (citing *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983)).  The court can then adjust the lodestar based on an evaluation of factors articulated in *Kerr v. Screen Extras Guild, Inc.*, 526 F.2d 67 (9th Cir. 1975) that are not subsumed under the lodestar calculation.  See also *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir. 1974).  the *Johnson/Kerr* test, the factors considered in determining the amount of attorneys' fees to be awarded include: "(1) the time and labor required, (2) the novelty and difficulty of the questions involved, (3) the skill requisite to perform the legal service properly, (4) the preclusion of other employment by the attorney due to acceptance of the case, (5) the customary fee, (6) whether the fee is fixed or contingent, (7) time limitations imposed by the client or the circumstances, (8) the amount involved and the results obtained, (9) the experience, reputation, and ability of the attorneys, (10) the 'undesirability' of the case, (11) the nature and length of the professional relationship with the client, and (12) awards in similar cases." *Kerr*, 526 F.2d at 70; see also *Clark v. City of Los Angeles*, 803 F.2d 987, 991 (9th Cir. 1986) (determining that upward adjustments to the lodestar figure are justified by factors such as the undesirability of a case, preclusion from other work, and the uncertainty of receiving any fee).

[24]Fees Motion at 5.

[25]Supp. Berk Decl., ¶ 3 (asserting that Berk Law performed 827 hours of work for a lodestar of $425,362); Supp. Gibbs Decl., ¶ 5 (asserting that Girard & Gibbs performed 2,427.74 hours of work for a lodestar of $951,532.55).

of $1,933,630.16.[26]  When counsel's costs of $60,969.49 are added,[27] this results in the $2 million award to which defendants have agreed.[28]  Counsel maintain that they will spend additional time working with class members to ensure adequate resolution of their claims.  They suggest, as a result, that the lodestar figure will increase in the months following final approval, with a concomitant reduction in the multiplier.[29]

### a.    Reasonableness of the Hourly Rate

To assist the court in calculating the lodestar, a plaintiff must submit "satisfactory evidence . . . that the requested rates are in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation."  *Blum*, 465 U.S. at 895-96 n. 11.  The relevant community is that in which the district court sits.  See *Schwartz v. Sec'y of Health and Human Serv.*, 73 F.3d 895, 906 (9th Cir. 1995).  Declarations regarding the prevailing market rate in the relevant community suffice to establish a reasonable hourly rate.  See *Widrig v. Apfel*, 140 F.3d 1207, 1209 (9th Cir. 1998); *Guam Soc'y of Obstetricians & Gynecologists v. Ada*, 100 F.3d 691, 696 (9th Cir. 1996) (noting that declarations from attorneys in the community can provide adequate proof of the reasonableness of counsel's rates).  See also *Earthquake Sound Corp. v. Bumper Industries*, 352 F.3d 1210, 1215 (9th Cir. 2003) (discussing the affidavit of "an attorney practicing in the same region as Earthquake's attorneys," which opined that "Earthquake's attorney rates were reasonable and customary"); *Center for Biological Diversity v. County of San Bernardino*, 185 Cal.App.4th 866. 900 (2010) (discussing an attorney declaration and market survey of rates as evidence of reasonable rates in the community).  Courts can also use survey data to evaluate the reasonableness of attorneys' rates.  See *Fish v. St. Cloud*

---

[26]Fees Motion at 13.  Class counsel originally sought a multiplier of 1.57, but the number of hours incurred in seeking final approval of the settlement has since risen, requiring only a 1.4 multiplier based on the lodestar figure suggested by plaintiffs.

[27]Berk Decl., ¶ 14 (asserting that Berk Law incurred $13,390.64 in litigation costs; Gibbs Decl., ¶ 12 (asserting that Girard Gibbs incurred $47,578.85 in litigation costs).

[28]Fees Motion at 13.

[29]*Id.* at 12.

*State Univ.*, 295 F.3d 849, 852 (8th Cir. 2002) ("The parties presented two surveys of hourly rates, one reporting fees received by seven Twin Cities class action firms and the other reporting fees received by sixty-two firms doing a variety of work around the state. The court set individual hourly rates at the median of the class action survey and near the upper limit of the statewide survey, also taking into account the number of years an attorney had been admitted to practice"); *American Petroleum Inst. v. United States EPA*, 72 F.3d 907, 912 (D.C. Cir. 1996) ("Petitioners have provided support for the reasonableness of their rates through affidavits and a survey of rates and we hold that these rates are reasonable"); *Martin v. University of South Alabama*, 911 F.2d 604, 607 (11th Cir. 1990) ("Based on the testimony and survey produced by plaintiffs the reasonable non-contingent hourly rate for civil rights lawyers in the relevant market (Alabama) was found to be $135 to $150 per hour for senior counsel and $105 to $115 per hour for junior counsel"); *Center for Biological Diversity*, 185 Cal.App.4th at 900.

Plaintiffs' counsel report that they expended 3,254.74 hours on this matter through July 28, 2010. They represent that, at normal hourly rates, their time charges would have been $1,376,894.55.[30] Below are the reported hours, rates, and totals for each partner, associate, paralegal, and support staff member who worked on the litigation, as well as the reported hours for the remaining "response team," who are trained support staff:[31]

---

[30]Supp. Berk Decl., ¶ 3 (asserting that Berk Law performed 827 hours of work for a lodestar of $425,362); Supp. Gibbs Decl., ¶ 5 (asserting that Girard & Gibbs performed 2,427.74 hours of work for a lodestar of $951,532.55).

[31]Supp. Gibbs Decl., ¶ 7; Berk Decl., ¶ 11; Supp. Berk Decl. ¶¶ 5–10. The chart tracks the figures for all fee categories set forth in Gibbs supplemental declaration, which total hours of 2,358.02. (Supp. Gibbs Decl., ¶ 7.) This is approximately sixty hours lower than 2,427.74 hours Gibbs asserts were spent. (*Id.*, ¶ 5.) Gibbs does not explain this discrepancy in his declaration. The total hours reflected in the chart exceed by roughly another sixty hours the combined hours reflected in separate charts Gibbs supplies for each category of work performed. (*Id.*, ¶¶ 10, 13, 15, 17,19, 20). The court thus relies on the numbers of hours reflected in Gibbs's summary chart and assumes that additional hours were inadvertently omitted from the separate time category charts. Even with this adjustment, however, there appears to be no support for Gibbs's assertion that the firm spent 2,427.74 hours working on the case. Gibbs does state that he omitted from his calculation five members of the firm, who collectively billed an additional

| Name | Total Hours | Hourly Rate | Amount Requested |
|---|---|---|---|
| **PARTNERS:** | | | |
| Eric H. Gibbs | 265.91 | $675 | $179,489.25 |
| Steven Berk | 534.00 | $550 | $293,700.00 |
| Dylan S. Hughes | 399.35 | $545 | $217,645.75 |
| **ASSOCIATES:** | | | |
| Philip B. Obbard | 33.80 | $480 | $16,224.00 |
| Michael Lewis | 301.75 | $450 | $135,787.50 |
| Geoffrey A. Munroe | 185.85 | $445 | $82,703.25 |
| David K. Stein | 651.24 | $380 | $247,471.20 |
| **PARALEGALS:** | | | |
| Derek J. Connolly | 220.75 | $240 | $52,980.00 |
| Samantha J. Elboim | 156.92 | $200 | $31,384.00 |
| **SUPPORT STAFF:** | | | |
| Zachary Kady | 16.5 | $100 | $1,650.00 |
| Jessica Began | 4.0 | $100 | $400.00 |
| Response Team | 440.20 | $275 | $121,055.00 |
| **TOTALS** | 3,210.07 | | $1,380,489.90 |

As this chart reflects, the hours reported by specific individuals and/or groups generate a total hours figure that differs from that stated by Berk and Gibbs.  Because plaintiffs have failed to provide a clear calculation supporting their final numbers, the court relies on the detailed information presented and the resulting calculations, listed above, rather than the totals reported by Gibbs and Berk.

### i.    Attorneys' Rates

In support of their attorneys' hourly billing rates, plaintiffs proffer the declaration of

---

25.6 hours.  (*Id.*, ¶ 7).  This does not fully explain the discrepancy.

The 827 total hours reported by Berk is lower than the 855.5 hours detailed within his two declarations. (Supp. Berk Decl., ¶ 3.)  Once again, no explanation of the discrepancy is provided. Because the 855.5 hours are specifically detailed, however, the court adopts this figure for purposes of its calculation.

William Rubenstein.[32]  Originally prepared for submission in a separate matter, Rubenstein's declaration provides an analysis of 2010 attorney billing rates in the Southern California legal community.[33]  Based on multiple fee petitions, court decisions, and surveys concerning attorneys' fees charged in Southern California, Rubenstein tracks prevailing hourly rates according to the number of years an attorney has been in practice.[34]  He concluded that Eric Gibbs's rate of $675 was typical for an attorney with fifteen years of experience, that Dylan Hughes's rate of $545 was typical for an attorney with ten years of experience, and that Geoffrey Munroe's rate of $445 was typical for an attorney with seven years of experience.[35]  Given these attorneys' years in practice and the supporting information provided in the Rubenstein declaration, the court finds the rates reasonable.

Steven Berk has over twenty years of experience and has worked on several large class action cases.[36]  given his experience and the information on prevailing billing rates set forth in the Rubenstein declaration, the court finds his hourly rate of $550 reasonable as well.

As for associates Philip B. Obbard, Michael Lewis, and David K. Stein, plaintiffs have proffered no background information indicating the number of years they have been in practice. despite the court's request at the fairness hearing that they do so.  The court, however, has searched the State Bar of California's website, and takes judicial notice of the fact that Obbard has been admitted to practice in the state since 1988, while Stein has been admitted since 2008.  The pro hac vice application Lewis filed in this case states that he has been a member of the District of Columbia Bar since 2007.[37]  Since Obbard has been admitted to the bar for more than twenty

[32]Supp. Gibbs Decl., Exh. 1 ("Rubenstein Decl.").

[33]Rubenstein Decl., ¶¶ 23–24.

[34]*Id.*

[35]*Id.*, ¶ 24.

[36]Berk Decl., ¶¶ 3–4; Supp. Gibbs Decl., Exh. 2 (fairness hearing powerpoint presentation) at 33.

[37]Application to Appear Pro Hac Vice, Docket No. 13 (Oct. 30, 2009).

years, his $480 hourly rate appears reasonable in light of the information provided in Rubenstein's declaration.  Billing rates for lawyers two years out of school range from $200 to the high $400 range.[38]  Stein's hourly rate is $380, which is squarely within this range.  Consequently, the court finds it reasonable as well.  Finally, the court finds Michael Lewis's $450 rate reasonable, given that Rubenstein charts fees for lawyers with three years in practice of $225 to the high $400 range.

### ii.    Paralegals' Rates

Plaintiffs provide no information supporting the $240 and $200 billing rates for Derek J. Connolly and Samantha J. Elboim.  Nor do plaintiffs provide any specific information about these individuals that would suggest expertise warranting rates above the average charged for paralegals in Southern California.  The court has found no cases awarding rates for paralegals in the range requested by plaintiffs.  Instead, courts in the Central District have recently found hourly fees between $125 and $175 reasonable for paralegal work.  See *Cruz v. Alhambra Sch. Dist.*, 601 F.Supp.2d 1183, 1195 (C.D. Cal. 2009) (finding "a rate of $ 125 to be in-line with the prevailing market rate" for paralegals); *Fitzgerald v. City of Los Angeles*, No. CV 03-01876 DDP (RZx), 2009 WL 960825, *11 (C.D. Cal. Apr. 7, 2009) (finding a paralegal rate of $175 reasonable).  Based on these recent cases and the court's own knowledge of prevailing market rates, the court concludes that $150 an hour is a reasonable rate for the work performed by Connolly and Elboim.

### iii.   Support Staff Rates

When applying a lodestar analysis, courts generally exclude time spent on clerical or ministerial tasks because such work is part of the attorney's overhead and is reflected in his or her hourly rate. See *Missouri v. Jenkins*, 491 U.S. 274, 288 n. 10 (1989) ("[P]urely clerical or secretarial tasks should not be billed at a paralegal [or lawyer's] rate, regardless of who performs them").  Where support staff do substantive case-related work, however, fees for such work are recoverable.  *Id.* at 285 ("Clearly, a 'reasonable attorney's fee' cannot have been meant to compensate only work performed personally by members of the bar.  Rather, the term must refer

---

[38]Rubenstein Decl., ¶ 24, Graph 1.

15

to a reasonable fee for the work product of an attorney.  Thus, the fee must take into account the work not only of attorneys, but also of secretaries, messengers, librarians, janitors, and others whose labor contributes to the work product for which an attorney bills her client"); *Earthquake Sound Corp. v. Bumper Industries*, 352 F.3d 1210, 1214-15 (9th Cir. 2003) (upholding a lodestar-based fee award that included work performed by attorneys, paralegals, and clerks); *Grays Harbor Adventist Christian Sch. v. Carrier Corp.*, No. 05-05437 RBL, 2008 WL 1901988, *5 (W.D. Wash. Apr. 24, 2008) (accepting class counsel's lodestar calculation that included fees for support staff, and noting that "if recoverable lodestar were limited to attorney time, law firms would be inclined to assign low-level work to attorneys rather than legal support staff.  The Ninth Circuit discourages such an inefficient result by recognizing the contributions of attorneys and non-attorneys").

Plaintiffs here seek recovery for work performed by support staff who interviewed class members regarding the problems experienced with the brake pads, answered class members' questions regarding the proposed settlement, and advised class members how to seek reimbursement through the claims administrator.[39]  Plaintiffs represent that the tasks they performed were not "administrative or clerical work."[40]  Accordingly, the court concludes that the support staff performed substantive case-related work that is recoverable.  See *Almodova v. City & County of Honolulu*, No. 07-00378 DAE-LEK, 2010 WL 1372298, *10 (D. Haw. Mar. 31, 2010) (permitting recovery of fees for time expended by non-attorney staff members trained to conduct surveys).

Plaintiffs, however, provide no support for the hourly fees charged for this work.  Girard Gibbs suggests a blended rate of $275 an hour for "specially trained support staff" working on the response team.[41]  Berk Law seeks $100 an hour for its support staff members.  The court finds the lower rate of $100 an hour reasonable for support staff trained to work with class members

[39]Supp. Gibbs Decl., ¶ 20.

[40]*Id.* at ¶ 8.

[41]*Id.* at ¶¶ 8, 20.

16

on the issues related to this settlement.  See *id*. (approving hourly rate of $105 for survey staff trained to deal with FLSA claims).  Accordingly, it will apply a $100 rate to work performed by non-attorney and non-paralegal support staff in calculating the lodestar.

### b.    Reasonableness of the Hours Expended

A court may award attorneys' fees only for the number of hours it concludes were reasonably expended on the litigation.  *Hensley*, 461 U.S. at 434 ("[Counsel] should make a good faith effort to exclude . . . hours that are excessive, redundant, or otherwise unnecessary"); *Center for Biological Diversity*, 2010 WL 3606173 at *6 ("[T]he fee setting inquiry in California ordinarily begins with the 'lodestar,' i.e., the number of hours reasonably expended multiplied by the reasonable hourly rate.  California courts have consistently held that a computation of time spent on a case and the reasonable value of that time is fundamental to a determination of an appropriate attorneys' fee award." (internal quotation marks omitted)).

"[T]he fee applicant bears the burden of documenting the appropriate hours expended in the litigation and must submit evidence in support of th[e] hours worked. . . .'"  *Gates v. Rowland*, 39 F.3d 1439, 1449 (9th Cir. 1994) (quoting *Gates v. Deukmejian*, 987 F.2d 1392, 1397-98 (9th Cir. 1992)); *Chalmers v. City of Los Angeles*, 796 F.2d 1205, 1210 (9th Cir. 1986) ("[C]ounsel bears the burden of submitting detailed time records justifying the hours claimed to have been expended"); *Pac. W. Cable Co. v. City of Sacramento*, 693 F.Supp. 865, 870 (E.D. Cal. 1988) ("The cases do not indicate that every minute of an attorneys' time must be documented; they do, however, require that there be adequate description of how the time was spent, whether it be on research or some other aspect of the litigation. . . ."). See also *Center for Biological Diversity*, 2010 WL 3606173 at *6 ("The "burden is on the party seeking attorney fees to prove that the fees it seeks are reasonable" (internal quotation marks omitted)).

### i.    Attorney Hours Expended

Gibbs states that attorneys in his firm expended time on six primary facets of the litigation: (1) pre-filing investigation and pleadings; (2) post-filing investigation and discovery; (3) settlement negotiations; (4) a settlement conference with the court and a mediation with Judge Infante; (5)

motions and related documents; and (6) post-settlement class member communications.[42]  As the senior attorney on the matter, Gibbs recorded 265.91 hours in connection with work on the case.[43]  Gibbs negotiated a settlement with Honda, attending both the settlement conference and mediation, and finalized the briefs and settlement documents filed with the court.[44]  Dylan Hughes, a junior partner, expended 399.35 hours.  He headed the investigation and discovery efforts and was also involved in settlement negotiations.[45]  David Stein, a junior associate, recorded 651.24 hours in connection with his work on the case.  Stein was involved in all facets of Gibbs Girard's work on the matter; he performed necessary legal research, reviewed documents, conducted factual investigation, drafted motions, and supervised the response to class members' questions regarding the settlement.  Geoffrey Munroe, an associate, spent 185.85 hours working on the case; he helped to draft motions seeking preliminary approval of the class settlement and attorneys' fees, as well as the mediation brief.  Phillip Obbard, an associate, recorded 33.80 hours in connection with on the case; he assisted in drafting the motion for final approval of the class settlement and performed legal research required to draft various briefs.[46]  Based on the information provided, the court finds that the number of hours recorded by the attorneys at Girard Gibbs was reasonable.

Berk states that he expended a total of 534 hours on this matter.[47]  Berk was involved in each of the six facets of the litigation identified by Gibbs.  He recorded 88 hours in connection with pre-filing investigation and drafting of the complaint; 107 hours for post-filing investigation and discovery; 135 hours in connection with settlement negotiations and agreements; 97 hours

---

[42]*Id.*, ¶ 6.  Gibbs provides charts detailing the hours expended by attorneys on each of these facets of the litigation.  (*Id.*, ¶¶ 10, 13, 15, 17,19, 20).  As noted, however, the sum of the hours in these categories is less than the total Gibbs presents.

[43]*Id.*, ¶ 7.

[44]*Id.*

[45]*Id.*

[46]*Id.*

[47]Supp. Berk Decl.

drafting and editing motions; 64 hours attending and preparing for the settlement conference and mediation; and 43 hours communicating with class members regarding the settlement and co-counsel regarding reaction to the settlement.[48]  Berk also states that his associate Michael Lewis expended a total of 301.75 hours on the case: 114 hours in connection with pre-filing investigation and drafting of the complaint; 92 hours for post-filing investigation and discovery; 46 hours related to settlement negotiations and agreements; 19 hours drafting and editing motions; 9 hours attending and preparing for the settlement conference and mediation; and 21 hours communicating with class members regarding the settlement and co-counsel regarding reaction to the settlement.[49]  Based on the information provided, the court finds that the number of hours expended by attorneys at Berk Law was reasonable.

### ii.  Paralegal Hours Expended

Gibbs also states that Samantha Elboim, a paralegal at Girard Gibbs, recorded 156.92 hours working on the matter.[50]  Elboim was primarily involved in pre-filing investigation and discovery, spending over a hundred hours on these facets of the litigation.[51]  Derek Connolly, a second paralegal, recorded 220.75 hours, almost all of which involved work with the Girard Gibbs response team to coordinate responses to calls and emails from class members.[52]  Based on the information provided, the court finds that the hours expended by these individuals were reasonable.

### iii.  Support Staff Hours Expended

As noted, plaintiffs also seek recovery for work performed by support staff who interviewed class members regarding problems encountered with their brake pads, answered class

---

[48]*Id.*, ¶¶ 5–10.

[49]*Id.*

[50]Supp. Gibbs Decl., ¶ 7.

[51]*Id.*, ¶¶ 10–13.

[52]*Id.*, ¶¶ 7, 20.

members' questions regarding the proposed settlement, and advised class members on how to seek reimbursement through the claims administrator.[53]   A majority of this work appears to have occurred after notice of the proposed settlement was sent to the class.  Counsel notes that they had to train staff to respond to the hundreds of calls and emails received from class members about the settlement.  In total, plaintiffs seek recovery for 460.5 hours of time that were spent training support staff and having them respond to class members.  Based on the information provided, the court finds these hours reasonable.

### c.   Lodestar Calculation

After reviewing the reasonableness of the rates and hours requested by class counsel, the court finds that the lodestar is $1,275,325.90, prior to any consideration of a multiplier.

| Name | Total Hours | Hourly Rate | Amount Requested |
|---|---|---|---|
| **PARTNERS:** | | | |
| Eric H. Gibbs | 265.91 | $675 | $179,489.25 |
| Steven Berk | 534 | $550 | $293,700.00 |
| Dylan S. Hughes | 399.35 | $545 | $217,645.75 |
| **ASSOCIATES:** | | | |
| Philip B. Obbard | 33.80 | $480 | $16,224.00 |
| Michael Lewis | 301.75 | $450 | $135,787.50 |
| Geoffrey A. Munroe | 185.85 | $445 | $82,703.25 |
| David K. Stein | 651.24 | $380 | $247471.20 |
| **PARALEGALS:** | | | |
| Derek J. Connolly | 220.75 | $150 | $33,112.50 |
| Samantha J. Elboim | 156.92 | $150 | $23,538.00 |
| **SUPPORT STAFF:** | | | |
| Zachary Kady | 16.5 | $100 | $1,650.00 |
| Jessica Began | 4.0 | $100 | $400.00 |
| Response Team | 440.20 | $100 | $44,020.00 |
| **TOTALS** | **3,210.07** | | **$1,275,325.90** |

---

[53]Supp. Gibbs Decl., ¶ 20.

d.      **Costs**

As noted, plaintiffs expended $60,969.49 in litigation costs during the course of the litigation.[54] Girard Gibbs spent $47,578.85 to cover fifteen categories of expense.[55] The majority of these costs were for experts ($16,579.88), the private mediator ($6,375), and research ($16,639.29).[56] Berk Law spent an additional $13,390.64 in four categories;[57] a majority of the costs were for travel ($8,122.53) and lodging ($2,618.12).[58] Based on the information provided, the court finds that the costs are reasonable

e.      **Whether an Enhancement of the Lodestar Is Warranted**

Plaintiffs contend that a multiplier should be applied to increase the lodestar figure.[59] As discussed, the court finds that the lodestar based on class counsel's reasonable hours and fees is $1,275,325.90.  After subtracting the $60,969.49 in costs from the total $2 million sought, the lodestar would need to be increased by a multiplier of 1.5 in order to support the total amount requested by plaintiffs.  Accordingly, the question for the court is whether a multiplier of 1.5 is reasonable in this case.

To determine whether to enhance the initial lodestar calculation, the court must examine several factors, including the novelty and difficulty of the case, the skill displayed in presenting the case, the extent the litigation precluded other employment by the attorneys, and the contingent nature of the fee award.  *Ketchum*, 24 Cal.4th at 1132.  "The purpose of such adjustment is to fix a fee at the fair market value for the particular action.  In effect, the court determines, retrospectively, whether the litigation involved a contingent risk or required extraordinary legal

[54]Berk Decl., ¶ 14; Gibbs Decl., ¶ 12.

[55]Gibbs Decl.,¶ 12.

[56]*Id.*

[57]Berk Decl., ¶ 14.

[58]*Id.*

[59]Fees Motion at 13.  Class counsel originally sought a multiplier of 1.57 based on the lodestar figure originally presented.

skill justifying augmentation of the unadorned lodestar in order to approximate the fair market rate for such services." *Graham v. DaimlerChrysler Corp.*, 34 Cal.4th 553, 579 (2004). "There is no hard-and-fast rule[, however,] limiting the factors that may justify an exercise of judicial discretion to increase or decrease a lodestar calculation." *Thayer v. Wells Fargo Bank, N.A.*, 92 Cal.App.4th 819, 834 (2001).

Here, several factors warrant an enhancement of the lodestar. First, class counsel handled the matter on a contingency basis. As noted in the court's order approving the settlement, there was no guaranty that the claims would have been successful had the case proceeded to trial. Thus, the risk class counsel assumed in handling the case on a contingency fee basis supports an enhancement of the lodestar. *See Graham*, 34 Cal.4th at 579–80 ("One of the most common fee enhancers . . . is for contingency risk. 'A lawyer who both bears the risk of not being paid and provides legal services is not receiving the fair market value of his work if he is paid only for the second of these functions. If he is paid no more, competent counsel will be reluctant to accept fee award cases,'" quoting *Ketchum*, 24 Cal.4th at 1132–33). Second, class counsel succeeded in negotiating significant compensation for class members within a year of filing the case; the rapidity with which a settlement was reached will help limit class members' damages. *See Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1048 (9th Cir. 2002) (noting that "[e]xceptional results are a relevant circumstance" in determining the final award of fees). Finally, class counsel will continue to work with class members as they seek reimbursement under the settlement over the coming months. Thus, the amount of fees reasonably incurred by class counsel will increase warranting modification of the current lodestar amount.

In light of these factors, the court finds that an enhancement of the lodestar based on a multiplier of 1.5 is reasonable. *See Consumer Privacy Cases*, 175 Cal.App.4th 545, 551 (2009) (affirming a 1.75 multiplier); *see also Vizcaino*, 290 F.3d at 1051 (affirming district court's use of a 3.65 multiplier); *Castaneda v. Burger King Corp.*, No. C 08-04262 WHA, 2010 WL 2735091, *3 (N.D. Cal. July 12, 2010) (finding a multiplier just under 2 reasonable where the parties agreed to fees under a clear sailing agreement and they were not to be paid from a common fund).

### 3.   Conclusion Regarding Reasonableness of Attorneys' Fees Request

For the foregoing reasons, the court finds that an award of $2 million in attorneys' fees and costs – as negotiated as part of the settlement in this case – is reasonable.  For this reason, the court finds that counsel did not operate under a conflict of interest in negotiating the settlement and the payment of attorneys' fees.  The court therefore grants plaintiffs' request for approval of the award.

### C.   Evaluation of Incentive Awards for Class Representatives

Plaintiffs also seek to have the court approve a $1,000 incentive award for each of the class representatives; Honda agreed to these payments as part of the settlement.  "[N]amed plaintiffs, as opposed to designated class members who are not named plaintiffs, are eligible for reasonable incentive payments."  *Staton v. Boeing Co.*, 327 F.3d 938, 977 (9th Cir. 2003).  The district court, however, must "evaluate their awards individually" to detect "excessive payments to named class members" that may indicate "the agreement was reached through fraud or collusion."  *Id.* at 975.  To assess whether an incentive payment is excessive, district courts balance "the number of named plaintiffs receiving incentive payments, the proportion of the payments relative to the settlement amount, and the size of each payment."  *Id*.

Vanessa Browne and Paul Moore do not appear to have been significantly involved in this litigation, but did spend several hours reviewing documents and working with class counsel regarding the claims asserted.[60]  The modest incentive awards proposed reflect this limited involvement, and are reasonable given the time they dedicated to the case and their commitment to providing further discovery.  See *Cicero v. DirecTV, Inc.*, No. EDCV 07-1182,  2010 WL 2991486, *7 (C.D. Cal. July 27, 2010) (approving incentive awards of $5000 and $7,500 where the class representatives "actively participated in the action by assisting counsel and responding to discovery"); *Williams v. Costco Wholesale Corp.*, No. 02cv2003 IEG (AJB), 2010 WL 2721452, *7 (S.D. Cal. July 7, 2010) (approving a $5000 incentive award); *Cervantez v. Celestica Corp.*, No. EDCV 07-729-VAP (OPx), 2010 WL 2712267, *6 (C.D. Cal. July 6, 2010) ("An

[60]Fees Motion at 19.

1  award of $2,000 is reasonable, considering the time Plaintiffs expended, the applicable risks, and

2  the awards other Class Members will receive").   Accordingly, the court grants plaintiffs' request

3  for approval of these incentive awards.

4

5                                      **III.    CONCLUSION**

6          For the forgoing reasons, the court approves class counsel's request for an award of $2

7  million in attorneys' fees and costs.   The court also approves the incentive awards of $1,000 for

8  each of the class representatives.

9

10  DATED: October 5, 2010

                                                    MARGARET M. MORROW
11                                                  UNITED STATES DISTRICT JUDGE

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28